TELE-COMMUNICATIONS, INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 268-89. Filed November 7, 1990.

*Edward C. Rustigan, Joseph R. Goeke, Jedd S. Palmer, Barry Gassman, Roger J. Jones,* and *William A. Schmalzl,* for the petitioner.

*Lawrence C. Letkewicz* and *Jan E. Lamartine,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable year 1978 in the amount of $897,436. In addition to disputing the deficiency, petitioner claims an overpayment of $318,239 for that year.

The issues for decision are whether a cable television franchise is a "franchise" for purposes of section 1253,[1] or whether the cable television franchises acquired by peti-

---

[1]Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable year 1978, and Rule numbers refer to the Rules of Practice and Procedure of this Court.

tioner have a "limited life," thus making such franchises eligible for amortization under section 167. If we decide that petitioner is entitled to amortize the franchises, we must determine what the amount of the cost basis of each franchise eligible for amortization is, and finally, whether petitioner is entitled to include in the cost basis for amortization $2,500 for accounting expenses incurred in connection with the acquisition of the franchises.

Both parties have agreed that another issue, involving a net operating loss carryback from petitioner's 1981 taxable year to its 1978 taxable year, should be severed from the current litigation. The proper calculation of the disputed carryback is dependent upon the calculation of taxable income or loss for petitioner's 1981 taxable year which the parties stipulate is not possible at this time.

### FINDINGS OF FACT

Some of the facts in this case have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

Tele-Communications, Inc., petitioner, is a Delaware corporation with its principal office in Denver, Colorado, at the time of the filing of its petition.

### *Background*

During the taxable year in issue, petitioner was the third largest cable television operator in the United States, serving over 500,000 subscribers.

A cable television system[2] distributes radio and television signals to consumers, known as "subscribers," through cables installed on utility poles or laid underground. For this service, the cable television company operating the system charges the subscriber a fee.

Broadcast signals from distant cities are usually picked up by a cable television system through the use of tall towers and sophisticated antennae and, at times, are brought to the system via microwave relay systems or satellite transmission; in addition, programming on separate

---

[2] A cable television "system" includes the tangible assets of the operation as well as the franchise granted by the local governmental authority. A "franchise" means only the intangible right to maintain and operate the system within the local government's jurisdiction.

channels is sometimes generated by the system itself. Cable television systems typically distribute the radio and television signal to each user through a wire attached to utility poles. The cable company enters into a pole attachment agreement with the utility company that owns the poles.

At each residence, a portion of the combined television signal is extracted by a device called a "tap" which is analogous to a tap on a water line. The cable from the tap is fed into a subscriber's house and attached to the television set, thereby permitting the subscriber to receive the radio and television signal.

TCI Cablevision, Inc., a Nevada corporation, was a wholly owned subsidiary of petitioner in 1978 and was a member of petitioner's consolidated group. For purposes of this opinion, we will refer to TCI Cablevision, Inc., as petitioner.

Athena Communications Corp. (Athena) is the parent corporation of Athena Cablevision Corp. (Athena Cablevision). Athena was a publicly held corporation which was formed by Gulf & Western in 1971.

In three separate transactions in December 1971 and January 1972, Athena issued its common stock, preferred stock, warrants, and a note to Gulf & Western in exchange for all of the capital stock of Athena Cablevision. In July 1972, petitioner acquired all of the outstanding Athena preferred stock and warrants and 16.8 percent of the common stock. The remaining common stock was distributed to the shareholders of Gulf & Western.

Generally, Athena officers and directors were either officers or directors, or both, of petitioner or one of its subsidiary or affiliated companies. Petitioner and Athena were also parties to a management agreement whereby petitioner's management provided administrative services and assumed managerial responsibility for Athena's cable television systems. This agreement was entered into on October 31, 1973, and was in effect through the end of 1978.

Athena Cablevision, although a wholly owned subsidiary of Athena, had several wholly owned subsidiaries of its own, including North Brevard Cable Television Co., Inc., which owned and operated a cable television system in Titusville, Florida (the Titusville system), and in the contiguous areas

of Brevard County (the Brevard County system);[3] International Telemeter Corp., which owned and operated a cable television system in Jefferson City, Missouri (the Jefferson City system); and International Telemeter of Moberly Corp., which owned and operated a cable television system in Moberly, Missouri (the Moberly system).

On January 25, 1978, several subsidiaries of Athena Cablevision sold four cable television systems to petitioner. Only three of the four systems sold to petitioner are involved in the issues presented in this case, specifically, the Titusville, Jefferson City, and the Moberly systems. For reasons not disclosed by the record, petitioner no longer contends it is entitled to amortize the fourth system, located in Columbia, South Carolina. The aggregate consideration petitioner paid to Athena for the four systems was $10,400,000, consisting of $6,700,000 in cash and the cancellation of $3,700,000 of Athena's indebtedness to TCI and its subsidiaries. Petitioner financed the acquisition through various sources. First, petitioner obtained a loan of $8 million from the Bank of New York and the Philadelphia National Bank, with the Bank of New York acting as the principal lender. Second, Cablevision agreed to lend Athena Cablevision $3 million. Finally, Cablevision obtained a noninterest-bearing obligation from Port Arthur Cablevision, Inc., one of petitioner's subsidiaries, for $1,700,000, due on January 1, 1985.

### Control by the Franchisor

The construction and operation of a cable television franchise system requires the permission, called a "franchise," by the local governmental unit which is typically a municipality. This agreement between the governing body (franchisor) and the cable television system operator (franchisee) is established by enacting an ordinance. Petitioner believed permission was required from the municipalities to operate a cable television system and the operation of a

---

[3]The Titusville cable system actually included two separate franchises, one for the City of Titusville pursuant to an agreement dated Dec. 21, 1967, for a 15-year period and one for the contiguous unincorporated areas of Brevard County, Florida, granted by the Board of County Commissioners on Aug. 15, 1974, also for a period of 15 years. In referring to the "Titusville system," we will include the Brevard County system unless otherwise stated.

system by petitioner was never contemplated unless a franchise was granted.

## 1. Jefferson City Franchise

On April 21, 1971, the City Council of Jefferson City passed ordinance 8356. This ordinance was in effect during the taxable period in issue and permitted petitioner to establish and operate the cable television system for 10 years, subject to numerous concessions to the franchisor. Among the various conditions in the agreement, the municipality prohibited petitioner from assigning any rights granted by the ordinance without prior approval of the city council. Also, the franchisor set the maximum which petitioner could charge for basic cable service and set the specific channels which were required to be carried as a part of basic cable service.

Petitioner was required to pay the franchisor 5 percent of its annual gross operating revenues from its service under the franchise, or a minimum of $10,000. In addition, petitioner posted a $50,000 bond to guarantee that cable television service would be properly furnished and maintained in the community.

Further, the franchisor prescribed specific construction standards for petitioner's facilities, as well as the minimum number of television channels, mandatory free FM radio signal service, free service for certain public buildings, and particular programming which petitioner was prohibited from offering to its customers.

## 2. The Moberly Franchise

On February 6, 1978, the City Council of Moberly enacted ordinance 5587. This ordinance was in effect during the taxable period in issue and permitted petitioner to establish and operate the cable television system for 10 years, subject to numerous concessions to the franchisor. Among the various conditions in the agreement, the municipality prohibited petitioner from assigning any rights granted by the ordinance without prior approval of the city council. Also, the franchisor set the maximum which petitioner could charge for basic cable service and required free FM radio signal service to subscribers.

Petitioner was required to pay the franchisor 3 percent of its gross annual basic subscriber revenues under the franchise, with a provision for an increase to 5 percent of those revenues. In addition, petitioner was required to maintain a local office with regular business hours where subscribers could visit or telephone with complaints.

Further, the franchisor prescribed specific construction standards for petitioner's facilities and required free service for certain public buildings. The franchisor also prohibited petitioner from entering into any service contract with a subscriber and required petitioner to provide television signals in color if technically feasible.

### 3. The Titusville Franchise

On June 14, 1966, the City Council of Titusville promulgated ordinance 44-1966. This ordinance was in effect during the taxable period in issue and permitted petitioner to establish and operate the cable television system for 15 years, subject to numerous concessions to the franchisor. Among the various conditions in the agreement, the municipality prohibited petitioner from assigning any rights granted by the ordinance without prior approval of the city council. Also, the franchisor set the maximum which petitioner could charge for basic cable television service, as well as the minimum number of channels required to be carried as a part of basic cable service, and required that petitioner provide a color television signal.

Petitioner was required to pay the franchisor a 5-percent gross revenue tax, with an escalation to 8 percent over the life of the franchise. In addition, petitioner was to make available to the franchisor all of its plans and contracts, as well as its engineering, accounting, financial, statistical, customer, and service records relating to the operation of the franchise.

Further, the franchisor prescribed specific construction standards for petitioner's facilities, as well as free service for certain public buildings. Also, the franchisor set out technical specifications and limited certain programming and business activity under which petitioner was to operate. In addition, petitioner was required to maintain a local office with regular business hours open to the public, and

one of petitioner's officers or principal stockholders was required to be a resident manager of the system.

### 4. The Brevard County Franchise

On August 20, 1973, the government of Brevard County passed ordinance 73-18. This ordinance was in effect during the taxable period in issue and permitted petitioner to establish and operate the cable television system for 15 years, subject to numerous concessions to the franchisor. Among the various conditions to the agreement, the ordinance prohibited petitioner from assigning any rights granted without prior approval. Also, the franchisor retained the right to establish and change the rates which petitioner could charge for its cable television service.

Petitioner was required to pay the franchisor 3 percent of its annual gross revenue under the franchise. In addition, petitioner was to make available to the franchisor all of its plans and contracts, as well as its engineering, accounting, financial, statistical, customer, and service records relating to the operation of the franchise.

Further, the franchisor prescribed specific construction standards for petitioner's facilities, as well as the minimum number of channels and free service for certain public buildings. In addition, petitioner was required to maintain a local office with regular business hours open to the public, and one member of petitioner's management staff was required to be a resident manager of the system.

### Cable System Value

The cable television industry is capital-intensive in the same manner as the gas, telephone, electric, water, and other public utilities. The capital-intensive nature of the cable industry generally precludes situations in which a second cable operator constructs another cable system to serve and compete for the same subscribers in the same franchise area. Such competition would generally result in neither cable television system operator earning a fair return on its investment. Thus, competing cable systems are generally not constructed, even in areas where the franchising authority desires a second cable system.

Although each franchise in question did not provide an "exclusive" right for petitioner to operate a cable television system, in economic reality there was no possibility that a competitor could construct and operate another cable system with any realistic hope of financial success. Petitioner, therefore, enjoyed a de facto or natural monopoly for its services in each area in which it held a franchise because, if a resident of the municipality wanted "cable television," i.e., distant television station signals or system-originated programming, the resident would have to subscribe to petitioner's cable system.

At the time petitioner acquired the Jefferson City and Titusville cable systems, there were a large number of subscriber complaints because Athena's poor financial condition prevented it from making the investment necessary to provide a satisfactory level of service in those communities. Customer satisfaction, or lack of it, was not a factor petitioner considered when valuing a cable system before purchasing it. In fact, the poor reputation of an existing franchisee often works to the buyer's advantage because the buyer then has the opportunity to improve the system.

Petitioner's acquisition of the Moberly, Jefferson City, Titusville, and Columbia, South Carolina, cable systems constituted an arm's-length transaction at a price which represented the fair market value of each system. The purchase agreement allocated the $10,400,000 purchase price among the four cable systems which petitioner acquired, as follows:

| | |
|---|---|
| The Moberly system | $1,215,000 |
| The Jefferson City system | 2,112,885 |
| The Titusville system | 2,747,115 |
| The Columbia, S.C., system | 4,325,000 |
| | 10,400,000 |

After deducting the Columbia, South Carolina, system, the remaining $6,075,000 was allocated among the Moberly, Jefferson City, and Titusville systems on the basis of their miles of cable as of September 30, 1977. On that date, the Jefferson City system had approximately 120 miles of cable, the Moberly system, 69, and the Titusville system, 156.

The tangible assets of a cable television system include, principally, various electronic devices which make up what

is called the "head-end." These electronic components are necessary to receive the signals of broadcast television stations or other programming sources offered by the cable system. Additional tangible assets include coaxial cable, amplifiers, converters, and other hardware. The tangible assets of the systems as of the acquisition date had an aggregate fair market value of $3,326,000, allocated as follows:

| | |
|---|---|
| The Moberly system | $623,000 |
| The Jefferson City system | 1,477,000 |
| The Titusville system | 1,226,000 |
| | 3,326,000 |

In the course of the Commissioner's examination of petitioner's Federal income tax return for its 1978 taxable year, petitioner requested an amortization deduction of $662,998 which the Commissioner refused to allow. Such a deduction, if permitted, would have resulted in a decrease of petitioner's taxable income by that amount and an overpayment of tax of $318,239. In its petition, petitioner claimed a cost basis for amortization of the franchises of $3,994,000. Petitioner requested the amortization deduction from the Commissioner under the provisions of section 1253(d)(2)(A) or, in the alternative, section 167 and section 1.167(a)-3, Income Tax Regs. Petitioner contests the disallowance, in the statutory notice of deficiency, of a deduction in the amount of $2,500 for accounting services related to the acquisition of the four cable systems.

OPINION

### Section 1253 Applicability

The first issue we must decide is whether a cable television franchise is a "franchise" as that term is used in section 1253(b)(1). This issue is a straightforward application of the principles of statutory construction. Section 1253 was enacted by section 516(c) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 646, and the pertinent parts provide:

SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES.

(a) GENERAL RULE.—A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

(b) DEFINITIONS.—For purposes of this section—

(1) FRANCHISE.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

(2) SIGNIFICANT POWER, RIGHT, OR CONTINUING INTEREST.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

\*       \*       \*       \*       \*       \*       \*

(d) TREATMENT OF PAYMENTS BY TRANSFEREE.—

(1) * * *

(2) OTHER PAYMENTS.—If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction—

(A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter;

The proposed regulations promulgated under section 1253 in 1971, but not finalized at the time of this dispute, elaborate on the definition of "franchise" to include "distributorships or other similar exclusive-type contractual

arrangements." Sec. 1.1253-2(a), Proposed Income Tax Regs., 36 Fed. Reg. 13148, 13151 (July 15, 1971). It is recognized that proposed regulations "carry no more weight than a position advanced on brief by the respondent." *Tomerlin Trust v. Commissioner*, 87 T.C. 876, 892 n.7 (1986); *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970).

Petitioner argues that it is entitled to amortize its costs in acquiring the Titusville, Jefferson City, and Moberly franchises pursuant to section 1253(d)(2)(A) over the remaining terms of the franchises at the time of acquisition or 10 years, whichever is shorter. Section 1253 does not address specifically the problem of a franchise from a prior franchisee to a subsequent franchisee. It can be argued that a literal reading of the statute precludes the subsequent franchisee from obtaining the benefits of amortization under section 1253(d)(2). Respondent, however, citing Rev. Rul. 88-24, 1988-1 C.B. 306, agrees that a subsequent franchisee is entitled to amortize that portion of the purchase price attributable to its acquisition of the prior franchisee's rights because, although—

the consideration for the franchise * * * was paid to the prior franchisee, the franchisor was a party to the transaction because the franchisor's consent was required to effect the transfer. The franchise rights run from the franchisor to the new franchisee, and the franchisor retains a significant power, right, or continuing interest. * * * [Rev. Rul. 88-24, 1988-1 C.B. at 307.]

Respondent argues, instead, that "cable television franchises" were never contemplated by Congress and, therefore, were simply not intended for the amortization provisions in section 1253(d)(2)(A).

Before turning to the arguments on each issue, it may be helpful to clarify some confusion on the particular mechanics in applying section 1253. Respondent contends that if the Court finds that a cable television franchise comes within the definition contained in section 1253(b)(1), then it must necessarily conclude that the franchising authorities each retained at least one significant power, right, or continuing interest described in section 1253(b)(2). This is not so.

Section 1253(b)(1) is the sole definition for "franchise" under the statute. Section 1253(b)(2) defines "significant power, right, or continuing interest" as that phrase is utilized in section 1253(a). The phrase "significant power, right, or continuing interest" is not mentioned as a component of the definition of "franchise" for section 1253 purposes.

Upon the conclusion that the rights acquired constitute a "franchise" as defined, then the full import of section 1253 comes into play. If a "significant power, right, or continuing interest" is maintained by a transferor after the exchange of a franchise, then capital gain treatment is denied to the transferor. Sec. 1253(a).

If capital gain treatment is denied under section 1253(a), then the transferee of a franchise may look to section 1253(d) for various methods of treating its payments to the party holding the franchise. Having set forth the steps of analysis under section 1253 transferee payments, we now address the arguments respondent makes in objection to petitioner's application of section 1253(d)(2)(A).

Respondent asserts that the definition of "franchise" in section 1253(b)(1), although clear in its terms, is nevertheless ambiguous and that such ambiguity lies not in the definition, but in that which is being defined, specifically, the term "franchise" itself. Respondent supports his argument by pointing to legislative history surrounding the enactment of section 1253. Petitioner objects to respondent's resort to legislative history because the definition of "franchise" in section 1253(b)(1) is clear and unambiguous, thereby rendering the assistance of legislative history wholly unnecessary.

Respondent acknowledges the general rule that reference to legislative history is prohibited when the statute is clear on its face but argues that this rule has substantial limits. *Harrison v. Northern Trust Co.*, 317 U.S. 476 (1943); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534 (1940); *Centel Communications Co. v. Commissioner*, 92 T.C. 612 (1989); *Latrobe Steel Co. v. Commissioner*, 62 T.C. 456 (1974).

Each of the cases relied upon by respondent is distinguishable from the instant situation. In *Harrison*, the Supreme Court stated that—

words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how "clear the words may appear on 'superficial examination.' " *United States v. American Trucking Assns.,* 310 U.S. 534, 543-44. See also *United States v. Dickerson,* 310 U.S. 554, 562. * * * [*Harrison v. Northern Trust Co., supra* at 479.]

*Harrison* relates to an extremely narrow exception which permits resort to legislative history upon a clear showing that the statutory language does not reflect Congressional intent. The Supreme Court in *Harrison* reversed the appellate court because its holding was based upon the earlier case of *Edwards v. Slocum,* 264 U.S. 61 (1924). The Supreme Court instructed the appellate court to look to the legislative history behind the Revenue Act of 1932 because the section at issue "was intended as 'a legislative reversal of the decision' in *Edwards v. Slocum." Harrison v. Northern Trust Co., supra* at 479.

In *American Trucking Associations, Inc.,* the Supreme Court held:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." * * * [*United States v. American Trucking Associations, Inc., supra* at 543-544; fn. refs. omitted.]

In the instant case, the plain meaning of section 1253 does not produce "absurd results." The resulting "absurdity must be so gross as to shock the general moral or common sense." *Crooks v. Harrelson,* 282 U.S. 55, 60 (1930). See also *Immigration and Naturalization Service v. Cardoza-Fonseca,* 480 U.S. 421, 452 (1987) (Scalia, J. concurring) (Statutory language is given effect "in the absence of a patent absurdity." (Citations omitted.)).

508

Respondent argues that petitioner's position, taken to its logical end, would mean that Congress intended section 1253 to apply equally to electrical utilities and hamburger franchises. Respondent claims that this could not be what Congress intended because there are fundamental economic differences between the two operations. We reject this contention.

It is true that electric, gas, and telephone utilities are generally operated under a monopoly in that there is usually only one of these types of businesses in a community, but beyond this observation, respondent fails to provide this Court with any authority as to why this distinction makes a difference in the interpretation of section 1253. The statute and its history are silent as to monopoly-type situations or market conditions that may have an influence on the operation of a business.

We cannot accept respondent's argument that the economic difference between cable television and other forms of businesses should play a factor in determining coverage under section 1253. The mere fact that there may be a disparity of economic operating environments between taxpayers does not in and of itself demonstrate that an absurd result would occur if cable television franchises were included in the definition of franchise under section 1253(b)(1).

The conclusion that cable television franchises are included in the section 1253 definition of franchise is not unreasonable or plainly at variance with the policy of the legislation as a whole. This is especially true given the awareness of Congress of the cable television industry at the time the statute was fashioned,[4] the conscious limitation of its application to "professional football, basketball, baseball, or other professional sport" in section 1253(e), and the otherwise broad definition of the term "franchise" itself.

The Tax Court cases relied upon by respondent are also inapposite. In *Latrobe Steel Co.* this Court held that it is "our duty to give effect to the intent of Congress by interpreting the general words of a section with reference to the whole statute, the purpose for which it was enacted, and

[4]Hearings on S. 1739, S. 1801, S. 1886, and S. 2303 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 86th Cong., 1st Sess. (1959).

its antecedent history." *Latrobe Steel Co. v. Commissioner, supra* at 462.

The term "franchise" in section 1253 is not a "general" word in the statute. To the contrary, the definition of "franchise" is the linchpin of section 1253. The word was not simply mentioned in passing and potentially susceptible to varying interpretations. Section 1253(b)(1) expressly provides an open-ended definition of franchise which *"includes* an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide * * * services * * * within a specified area." (Emphasis supplied.)

In *Centel Communications Co.,* the Court dealt with the question of whether the taxpayer's stock warrants were transferred "in connection with the performance of services" under section 83. The Court stated, "Unfortunately, the term 'the performance of services' * * * is not defined in section 83. * * * the regulations under section 83 provide little assistance." *Centel Communications Co. v. Commissioner, supra* at 627. Thus, the Court had the need to delve into legislative history to determine the meaning of a term not otherwise defined in the statute.

In the instant case, however, Congress has provided a clear definition for the term "franchise." A franchise, for section 1253 purposes, includes (1) an agreement (2) which gives one of the parties the right to distribute, sell, or provide goods, services, or facilities (3) within a specified area. Sec. 1253(b)(1).

Respondent does not argue that the various aspects of this definition are vague or ambiguous. In fact, respondent states that the definition is certainly clear enough. Rather, respondent argues that the ambiguity lies not in the definition, but in what is being defined, specifically, the term "franchise." We reject this argument as being internally inconsistent and logically circular.

The definition of "franchise" in section 1253(b)(1) sets out what constitutes a section 1253 franchise. Satisfaction of the three elements of section 1253(b)(1) results in bringing a franchise within the purview of that section of the Code.

Mindful of Gertrude Stein's poetic admonition that a "Rose is a rose is a rose," the fact that cable television franchises are commonly called "franchises" also has no

importance because Congress has the power to define the term as it pleases. The arrangement may well have been called a mere contract, but when the three elements under section 1253(b)(1) coalesce, a section 1253 franchise has been created. The important consideration is the substance of the taxpayer's activity and whether it falls within the definition of the Code, not the form or labels placed upon the activity. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Wood v. Commissioner*, 93 T.C. 114, 120 (1989); *U.S. Asiatic Co. v. Commissioner*, 30 T.C. 1373, 1381 (1958).

We disagree with respondent that resort to legislative history is appropriate in this instance because the term being defined is somehow vague. As previously noted, respondent readily admits that the statutory definition of "franchise" is clearly worded and unambiguous. We feel that Congress understood that the statute's language cut a broad stroke so Congress attempted to limit its impact where it desired, e.g., the exclusion for the transfer of "professional football, basketball, baseball, or other professional sport" franchises. Sec. 1253(e). We cannot disregard the direct and literal language of section 1253(b)(1). *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 173-174 (1978).

The plain language of a statute is the source of its interpretation. When that language is not ambiguous, it is conclusive, absent a clearly expressed legislative intent to the contrary. *Watt v. Alaska,* 451 U.S. 259, 265 (1981); *Consumer Product Safety Commission v. G.T.E. Sylvania, Inc.,* 447 U.S. 102, 108 (1980); *Richards v. United States,* 369 U.S. 1, 9 (1962). The section 1253 definition of franchise is clear and unambiguous.

Prior to the instant case, respondent has also recognized and applied the plain meaning of section 1253 to include cable television franchises within the franchise definition. See P.L.R. 8736049 (June 10, 1987), revoked by P.L.R. 8922045 (March 3, 1989). We recognize these documents do not have the force of law, but mention their existence to show that before this case, it was understood that section 1253 included cable television franchises. *Silco, Inc. v. United States,* 779 F.2d 282, 287 (5th Cir. 1986); *Haley Bros. Construction v. Commissioner,* 87 T.C. 498, 516-517 (1986); *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986).

In any event, respondent's resort to legislative intent does not further the position that Congress intended to exclude cable television franchises from the burdens and benefits of section 1253. An examination of the legislative history does not support the assertion that Congress intended to exclude cable television franchises from coverage under section 1253.

Respondent argues that cable television franchises are "public" franchises and are, therefore, excluded from section 1253, because the franchising authority is a municipality and not an agreement made between two private parties. Thus, respondent contends, Congress had no reason to provide a specific exclusion for cable television or other public franchises, as it did for professional sports franchises in section 1253(e), because Congress simply did not contemplate that section 1253 applied to anything other than the typical private business franchise.

Respondent states that the impetus behind the enactment of section 1253 was the fact that a number of Dairy Queen franchisors which were receiving capital gain treatment on franchise transfers which were not really sales. Respondent quotes from the Committee reports and argues that the wording is couched in terms which can only apply to a "business" franchise but not to a "public" franchise.

In an effort to define a business franchise, as distinguished from a cable franchise, respondent presented William B. Cherkasky, President of the International Franchise Association, to point out three main differences between the two types of franchises. According to Mr. Cherkasky, a business franchise, such as a McDonald's or Burger King restaurant, involves (1) the licensing of a protected trademark, (2) no negotiability on the part of the franchisee, and (3) ongoing interaction between the franchisor and the franchisee.

Respondent argues that Mr. Cherkasky's definition of a "franchise" was that which Congress had in mind when it fashioned section 1253 and that a cable television franchise does not come within this definition because: (1) It does not involve the licensing of a trademark due to the fact that customers generally do not care what the cable television company is called; (2) the municipality (franchisor) and the

cable television company (franchisee) undergo intense nego-
tiation unlike a business franchisor which generally offers
its prospective franchisee a "take it or leave it" contract;
and (3) although there may be some limited interaction
between a municipality and a cable television company, that
assistance is not nearly as extensive as the ongoing
involvement which typically exists in a business franchise,
such as a McDonald's or Burger King-type arrangement.
Respondent, therefore, insists that section 1253 must be
interpreted as applicable only to private business franchises
and not to public franchises, such as petitioner. We
disagree.

Nothing appears in the legislative history to limit the
scope of section 1253 franchises to certain kinds or types of
franchises. Indeed, the exclusion of only *professional* sports
indicates that Congress decided to deny section 1253
treatment to certain franchises which would otherwise be
subject to section 1253.

Once an arrangement satisfies the three elements set
forth in section 1253(b)(1), it is included under section 1253,
regardless of the type of business it may be, for nontax
purposes, provided there is no specific exclusion, as is the
case for professional sports. See generally Hall, "Tax
Aspects of Franchising Operations - The Scope of Section
1253," 20th Ann. Tulane Tax Institute 102, 137-141 (1971).
We suppose Congress could have included only "business"
franchises, in view of the fact that the different types of
franchises existed when the statute was enacted, or cable
television franchises could have specifically been excluded
altogether; however, "Congress did not write the statute
that way." *United States v. Naftalin,* 441 U.S. 768, 773
(1979). Even Mr. Cherkasky admitted that the definition of
franchise *as provided by section 1253(b)(1)* was much
broader than his concept of a "business" franchise.

In examining the legislative history pertinent to the
definition provisions of section 1253, the House report
contains a rather circular definition:

The term "franchise" is defined by the bill to mean a franchise,
distributorship, or other like interest. This would include subfranchises,
subdistributorships, and other similar exclusive type contract arrange-

ments to operate or conduct a trade or business. * * * [H. Rept. 91-413 (1969), 1969-3 C.B. 200, 302.]

The Senate report is more expansive:

The committee amendments also provide that the term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area. This would include distributorships or other similar exclusive-type contract arrangements to operate or conduct a trade or business within a specified area, such as a geographical area to which the business activity of the transferee is limited by the agreement. However, the committee amendments provide that the new rules are not to apply to the transfer of a franchise to engage in a professional sport. This exception applies only to franchises for teams to participate in a professional sports league, and would not apply to other franchised sports enterprises, such as a franchise to operate a golfing, bowling, or other sporting enterprise as a trade or business * * * [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 557.]

Respondent points to a dictionary definition of "franchise" to highlight the multiple connotations of that term. It is argued that the myriad of meanings in the dictionary underscores respondent's contention that there is more than one commonly accepted understanding of "franchise" and, thus, the term itself is inherently ambiguous.

Used alone, the term "franchise" is certainly susceptible to multiple interpretations. In section 1253, however, franchise is not an undefined or general term. Thus, a dictionary definition of a term which is defined in the Code has no relevance. See also 2A Sutherland's Statutory Construction, sec. 46.04, p. 86 (1984) (Resort to extrinsic "aids to interpretation can be used only to resolve ambiguity and never to create it.") (Fn. ref. omitted.). Although we agree with respondent that there are multiple definitions of "franchise" when the word is commonly used, the first definition for franchise contained in Black's Law Dictionary is "a special privilege conferred *by government* on individual or corporation, and which does not belong to citizens of country generally of common right." Black's Law Dictionary 592 (5th ed. 1979) (citations omitted; emphasis added).

In Webster's less technical unabridged dictionary, among the numerous definitions provided, a franchise is "a right to do business conferred by a government." Webster's Third New International Dictionary, Unabridged 902 (3d ed.

1981). This is precisely the type of franchise under which petitioner operates. Thus, the counter argument is equally plausible that Congress intended to include all government-granted (or "public") franchises under section 1253 simply because the dictionary provides for such a definition under the word "franchise," as long as the three elements for a franchise contained in section 1253(b)(1) are met.

Congress enacted the exceptions to the statute it wished to make. Sec. 1253(e). Therefore, the maxim of statutory construction "Inclusio unius est exclusio alterius" is applicable, i.e., by specifically excluding professional sports franchises, Congress included those other franchises not specifically excluded under the statute. *Stanton v. Commissioner*, 34 T.C. 1, 7 (1960). This also comports with the use of the word "include" in section 1253(b)(1). Principles of statutory construction follow the premise that when "include" is utilized, it is improper to conclude that entities not specifically enumerated are excluded. 2A Sutherland's Statutory Construction, sec. 47.07, p. 133 (1984) ("the word 'includes' is usually a term of enlargement, and not of limitation. . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated.") (Fn. ref. omitted.).

Therefore, because section 1253(b)(1) "includes" agreements in which one party has the right to distribute services in a specified area, and petitioner satisfies that definition, it is improper to exclude it from the statute's coverage. Consequently, we hold that this nonexclusive definition of franchise includes cable television franchises.

Our inquiry, however, does not end here. We must now decide whether petitioner is entitled to the amortization benefits under section 1253(d)(2). Amortization is allowable only if the transfer of the franchise is not a sale or exchange of a capital asset as provided in the general rule at section 1253(a). The question now is whether the transferor, in this case the municipalities, retained any "significant power, right, or continuing interest with respect to the subject matter of the franchise." Sec. 1253(a).

A nonexhaustive list of six items is provided under section 1253(b)(2) which, if only one of the items is shown,

will conclusively establish that the municipalities retained such a power, right, or continuing interest over the cable television franchises. Among the list is the right to disapprove of the assignment of an interest in the franchise, the right to prescribe the standard of quality for the services and of the equipment and facilities used in providing the services, and the right to payments contingent on the productivity or use of the franchise. Sec. 1253(b)(2)(A), (C), (F).

The Moberly, Jefferson City, and Titusville franchises vary somewhat, but contain substantially similar language for purposes of section 1253. Each franchise contains a provision permitting the franchisor to disapprove any assignment of the franchise which satisfies section 1253(b)(2)(A) and requires the conclusion that the franchisor retains a significant power, right, or continuing interest in the subject matter of the franchise. However, we also note additional characteristics which the franchises have in common.

All of the franchises prescribe minimum construction standards which involve the standard of quality factor in section 1253(b)(2)(C). The Brevard County franchise specifically set out service standards, while the Jefferson City, Moberly, and Titusville franchises established the minimum number of channels, or various other technical requirements, such as a color signal.

Petitioner was required to make a percentage payment on each franchise depending upon its productivity. Sec. 1253(b)(2)(F). The franchisors also exercised numerous controls over petitioner's business activities, such as basic rate structures, free service to certain buildings, and prohibited programming and business activities.

The actual exercise of these controls by the franchisors is not questioned by respondent. We conclude that the franchisor in each franchise retained a significant power, right, or continuing interest as required under section 1253(a), thereby disallowing treatment as the sale or exchange of a capital asset. Because the transfer of the franchise is not the sale or exchange of a capital asset as provided in section 1253(a), the payments made by the

franchisee (petitioner) qualify for the treatment outlined in section 1253(d)(2)(A).

## *Section 167 Applicability*

We have been urged to consider petitioner's alternative argument by treating the instant case as a test case for the cable television industry and examining the applicability of section 167 to cable television franchises. We decline the invitation. Our conclusion that section 1253 permits the amortization of the costs of acquiring the franchises disposes of this issue and, therefore, we need not decide whether the amortization would be allowable under section 167.

## *Valuation of the Franchise Asset*

We turn now to the remaining issue before us for resolution. We must calculate the proper value of the franchise itself apart from the total consideration paid by petitioner for purposes of section 1253 treatment. The burden is on the taxpayer to establish this amount. *Welch v. Helvering,* 290 U.S. 111 (1933); *Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463, 480 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990).

Petitioner claimed an amortization deduction based upon its assertion that it has a cost basis in the franchises totaling $3,994,000. The parties have stipulated, however, that of the $10,400,000 contract price, $4,325,000 was allocated to the South Carolina cable system which is no longer part of this dispute. The $6,075,000 remaining after the exclusion of the purchase price allocated to the South Carolina system is further reduced by the tangible assets in each of these franchises which, in the aggregate, total $3,326,000. Thus, the total amount available as petitioner's basis in the franchises cannot be more than $2,749,000 and not $3,994,000 as petitioner asserts in its petition.

In addition, we hold that petitioner has failed to carry its burden with respect to the $2,500 for accounting services. This amount was originally deducted as an expense and disallowed by the Commissioner. Petitioner concedes that the amount should have been capitalized but has not demonstrated whether these services were in fact related to

the acquisition of the franchises and, if so, how they should be allocated amongst them, particularly in light of the severance of the Columbia, South Carolina, franchise from this action. Petitioner simply makes no further mention of the $2,500 expenditure and, without more, we must sustain the Commissioner's disallowance of the claimed deduction. Rule 142(a).

Valuation issues present questions of fact that can be resolved only by weighing all of the evidence. *855 Investment Co. v. Commissioner*, 95 T.C. 156 (1990); *Stanley Works v. Commissioner*, 87 T.C. 389, 408 (1986). Such issues present a problem of judgment, not mathematics. *Hamm v. Commissioner*, 325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. "Valuation is * * * necessarily an approximation." *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. It is an inexact science at best, capable of resolution only by "Solomon-like" pronouncements. *855 Investment Co. v. Commissioner*, *supra* at 167 ; *Stanley Works v. Commissioner*, *supra* at 408; *Ketteman Trust v. Commissioner*, 86 T.C. 91, 98 (1986); *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Estate of Heckscher v. Commissioner*, 63 T.C. 485 (1975).

As we have already concluded, the total amount available to petitioner for franchise amortization is $2,749,000. Petitioner offered the testimony of two valuation firms to establish a basis in the franchises.

Petitioner's experts are Dr. Thomas E. Doerfler (Dr. Doerfler) and Mr. Jeffrey W. Traenkle (Mr. Traenkle), both from Arthur D. Little, Inc. (ADL), and Mr. William B. Shew (Mr. Shew) of the National Economic Research Associates, Inc. (NERA). Dr. Doerfler has a B.S. in mathematics from the University of Dayton, and an M.S. and Ph.D., both in statistics, from Iowa State University. Mr. Traenkle holds a B.S. in engineering from Princeton University and an M.B.A. from Harvard University. Mr. Shew holds a B.A. and an M.A. in economics from the University of Chicago.

Petitioner's experts conclude that the cost bases of the franchises are as follows:

|                          | *ADL*      | *NERA*     |
|--------------------------|-----------:|-----------:|
| Moberly franchise        | $519,905   | $229,243   |
| Jefferson City franchise | 459,035    | 449,699    |
| Titusville franchise     | 1,403,189  | 1,294,201  |
|                          | 2,382,129  | 1,973,143  |

ADL and NERA allocated $366,872 and $775,857, respectively, to other intangible assets to make up the difference between their franchise basis calculations and the potential cost basis of $2,749,000. (Because we find that Commissioner's disallowance of $2,500 for accounting expenses was proper, that amount should be added to petitioner's total cost basis for acquiring the four franchises.)

Respondent presented as his expert Dr. Gary L. French (Dr. French) of Nathan Associates, Inc. (Nathan Associates). Dr. French holds a B.B.A., an M.A. in economics, and a Ph.D. in economics from the University of Houston.

Dr. French's valuation report begins from a different premise than those of petitioner's experts. Although the parties have stipulated without objection that the $10,400,000 purchase price for the four cable television systems (including the Columbia, South Carolina, system) was on a "miles of cable" basis, Dr. French does not believe this allocation accurately reflects the value of each cable system.

Instead, Dr. French advocates a dollars-per-subscriber approach which reallocates the purchase price among the four systems. This method, Dr. French contends, is more accurate in reflecting each system's fair market value, but he admits that even the dollars-per-subscriber allocation method is not without its flaws. For example, a cable system in a community with a large population would be worth the same as one with a small population if both had the same number of current subscribers, even though the larger community may have more room for expansion and growth.

This reallocation by Dr. French does not account for the stipulated fact that the Columbia, South Carolina, franchise has been severed from the instant case and its value should not have been included among the three systems currently under examination. Although Dr. French makes an arguably credible observation, it is an undisputed stipulated fact that the allocation of the purchase price among the individual

cable television systems was at arm's length. We see no reason to disregard the stipulations and, therefore, reject Dr. French's reallocation of the purchase price of the cable television systems and hold that the parties are bound by the amounts stipulated without objection. Rule 91(e).

Respondent contends that the cost bases of the franchises are much lower, specifically:

| | |
|---|---|
| Moberly franchise | $125,354 |
| Jefferson City franchise | 261,155 |
| Titusville franchise | [5] 135,801 |
| | 522,310 |

Respondent maintains that the discrepancy between the cost bases of the franchises is due to petitioner's failure to account for goodwill in its calculation.[6] Respondent argues that goodwill is a nondepreciable capital asset and, therefore, cannot be included in the cost basis for amortization under section 1253.

Petitioner, on the other hand, contends that, although there may be an element of going concern value, each franchise benefited by operating in a de facto monopoly which, by its nature, does not allow for the existence of "goodwill." Thus, petitioner argues that after deducting the tangible assets and going concern value, whatever is left is an intangible asset of the cable television franchise, an asset that can be amortized under section 1253(d)(2).

Respondent counters that goodwill could exist because there was no true "monopoly." The franchises were "nonexclusive" in nature and, at least in theory, another cable operator could enter the market and compete, thereby destroying the alleged monopoly. Further, respondent argues that it has never been established that a franchise is necessary to construct and operate a cable television system.

Petitioner responds that State law generally requires the franchises to be nonexclusive, but this provision in the

---

[5] Respondent states separate values for the Titusville franchise of $105,246 and the Brevard County franchise of $30,555 which total $135,801. This separate treatment is not important to our decision.

[6] We note that each expert presented calculations which arrived at a basis lower than the cost basis for the franchises alleged by petitioner in its petition. Although petitioner claims a higher franchise cost basis, we feel this amount is unrealistic in light of the reports submitted by the valuation firms in this matter. ADL and NERA both started with $2,749,000 while Nathan Associates used $3,850,717.

franchise ordinance simply does not reflect business reality in the cable television industry. Petitioner never contemplated entering a local jurisdiction and constructing a cable system without permission from the appropriate authorities.

In economic theory, petitioner's status is accurately termed a "natural" monopoly because the capital-intensive nature of the cable television industry necessarily results in it delivering its service most efficiently through a single entity, thereby precluding additional cable systems. P. Samuelson & W. Nordhaus, Economics 588 (13th ed. 1989). As we have observed, even if a local government wanted a second cable television company to construct another system for purposes of competition, it is extremely unlikely that another operator would enter the market when the return on the investment simply would not justify the expenditure. The remote possibility that another cable system would have been constructed to compete with the existing system does not reflect the business reality at the time petitioner constructed and operated its cable systems. *Citizens & Southern Corp. v. Commissioner, supra* at 495; *Forward Communications Corp. v. United States,* 221 Ct. Cl. 582, 608 F.2d 485 (1979).[7]

We, therefore, reject respondent's contention that the nonexclusive nature of the franchise prevents the environment in which petitioner operated from being monopolistic. We are also unpersuaded with respondent's argument that petitioner may not have needed the franchise to operate its cable television system. Ample authority exists, both at the State and local level, to govern the lawful entry by a cable television operator into local jurisdictions.

The local government can control cable access under its general police powers reserved to it by the U.S. Constitution because the cable television operator must place its cable along public right-of-way. U.S. Const. amend. X. With regard to the Titusville system during the taxable year at issue, the Florida State Constitution grants broad authority for municipal and county actions not otherwise prohibited by law. Fla. Const. art. VIII, secs. 1, 2. Florida municipalities have home rule powers. Fla. Stat. Ann. sec. 166.021 (West 1977). Counties in Florida may grant an exclusive or

---

[7]See also *Krug v. Commissioner,* T.C. Memo. 1981-522.

nonexclusive license, in perpetuity or for a term of years, for the construction or operation of television lines along public streets. Fla. Stat. Ann. sec. 125.42 (West 1980). Likewise, in Missouri, with respect to the Moberly and Jefferson City franchises, municipalities have franchising authority. Mo. Ann. Stat. sec. 82.230 (Vernon 1971). We do not feel it would be a practical or prudent decision to advocate petitioner's violation of law in order to conduct its business.

We must also conclude that respondent's argument for the existence of goodwill in a cable television franchise is unfounded. Indeed, no valuation expert in this case assigns a value to goodwill. Petitioner's experts flatly reject the existence of goodwill in a monopolistic environment.

Goodwill is an elusive concept and is widely considered to be the "most intangible of intangibles." G. Smith & R. Parr, Valuation of Intellectual Property and Intangible Assets 88 (1989). In tax law, it is well established that the "nature of goodwill is the expectancy that 'old customers will resort to the old place.'" *Citizens & Southern Corp. v. Commissioner, supra* at 480; *Commissioner v. Killian,* 314 F.2d 852, 855 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 232 (1975). The essence of goodwill is the expectancy of continued patronage, for whatever reason. *Citizens & Southern Corp. v. Commissioner, supra* at 480; *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 681 (5th Cir. 1971).

On the basis of the facts presented, the concept of goodwill has no application. Potential cable television subscribers have no alternative but to go to the possessor of the right to deliver cable television services and, therefore, goodwill does not exist in the traditional sense. *Des Moines Gas Co. v. Des Moines,* 238 U.S. 153 (1915); *Montgomery Coca-Cola Bottling Co. v. United States,* 222 Ct. Cl. 356, 615 F.2d 1318, 1332 (1980), citing *Pennsacola Greyhound Racing, Inc. v. Commissioner,* T.C. Memo. 1973-225 (involving a racing permit, racing license, and liquor license).

Respondent contends that cable television simply has not risen to the level of a necessity in the same manner as electricity, gas, water, or telephone service. Respondent

argues that a family can do without cable television and, in fact, many do. Respondent misses the point.

If a television viewer in petitioner's franchise area wishes the unique package which makes up cable television, i.e., distant television signals or local origination programming, then a viewer has no choice but to subscribe to petitioner's service. When a business is conducted pursuant to rights granted it by a governmental body and economically is exclusive, as is the case here, it cannot have any goodwill separate and distinct from the value of its monopolistic franchise. *Omaha v. Omaha Water Co.,* 218 U.S. 180, 202 (1910); *Pasadena City Lines, Inc. v. Commissioner,* 23 T.C. 34, 40 (1954).

Although there may be an absence of goodwill in a monopolistic environment, it is clear that an operating business has a value which is defined as the element "which attaches to property by reason of its existence as part of a going concern." G. Smith & R. Parr, *supra* at 87, citing *VGS Corp. v. Commissioner,* 68 T.C. 563, 569 (1977). *VGS Corp. v. Commissioner, supra* at 592, adds "the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership, is a vital part of the value of a going concern." *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U.S. 287, 313 (1933); *Winn-Dixie Montgomery, Inc. v. United States, supra* at 685; *United States v. Cornish,* 348 F.2d 175, 184 (9th Cir. 1965); *Computing & Software, Inc. v. Commissioner, supra* at 235.

As we discuss below, the valuation by ADL most accurately reflects petitioner's franchise costs. ADL characterized going concern value as a nondepreciable capital asset and deducted this amount from the aggregate available to petitioner for amortization under section 1253.

Respondent's expert calculated petitioner's subscriber assets on an income method, but used a residual technique to place a value on the franchises. The report of Dr. French of Nathan Associates is flawed due to a fallacy in its underlying premise. When petitioner's purchase price was gratuitously reallocated, figures upon which Dr. French performed his calculations were inflated. Thus, respondent's conclusions are inherently unreliable.

Using detailed subscriber data from each cable system, ADL based its calculations on the income method of valuation. Its analysis most accurately reflects the franchise values because it makes use of subscriber data, thereby increasing the reliability of its assumptions. ADL makes its projections based upon the value of two subassets which make up the main asset, the franchise itself.

Respondent's expert believes that, although the franchise may be an asset, it is an asset which is separate and apart from the subscriber assets. The subscriber assets, according to Dr. French, consist of "base" and "future" subscribers and can be valued independently of the franchise. This premise is inconsistent with the monopolistic environment in which these franchises operated. Without the franchise, there are no subscribers. It is, therefore, impossible to construct a value for the subscribers without valuing the franchise itself.

The two subassets which ADL identified as making up the franchise are (1) the number of subscribers who were actually on hand at the time petitioner received the franchise, and (2) the potential of the cable system to attract new customers over time. ADL terms this second subasset "marketing rights." The term "marketing rights" is interchangeable with future subscribers.

The basic methodology which ADL used is logical and easily stated, even if its individual components are mathematically and statistically complex. ADL began by determining the value of each tangible asset which comprised petitioner's cost of acquiring the franchises. Then, ADL identified what intangibles had been purchased by petitioner and concluded that only two were acquired: going concern value and franchise value. Franchise value is the sum of the value of the current and the future subscribers.

ADL employed the income or discounted cash-flow method of valuation. Looking to the projected stream of cash through to the terminal year (last year of the franchise), ADL took this amount and discounted the future dollars to present value. The discount rate was derived using the widely accepted capital asset pricing model.

The going concern value was calculated using the difference between the current cash-flow and the cash-flow which would have resulted if the system were reconstructed. Dr. Doerfler calculated the franchise subasset values, current

and future subscribers, by using a "lifing" study performed on a statistical sampling of subscribers. This study provided a means of determining the length of time from which petitioner could expect the stream of income from the subscribers.

The lifing study utilized a factor to account for the discontinuation of service over the life of the franchise by some of the subscribers. This factor was derived by taking a 10-percent random sample from the actual subscriber rolls maintained by the cable system on a monthly basis from January 1974 through December 1978. Over this 47-month period, called the observable time frame, subscribers were grouped according to the length of time they were customers of the system: less than 5 months, 6 to 10 months, 11 to 20 months, 21 to 30 months, and more than 30 months.

Dr. Doerfler then applied the law of probability to calculate the survival/disconnect rate exhibited by the subscribers. The results were demonstrated with the graph of a decay pattern to forecast the time in which a current subscriber continues to remain a subscriber. Thus the probability of cancellation by the subscriber, by the customer's choice, or termination of the subscriber, e.g., for nonpayment, is connected to a corresponding point in time.

This method enabled ADL to predict, with mathematical precision, the length of time a subscriber would generate revenue for the system. The probability law calculation used in the lifing study is more accurate because, unlike alternative methods such as straight-line depreciation or the Iowa Curve, it recognizes a decrease in the probability of cancellation as a subscriber becomes more mature. It also provides for a statistically valid means of determining the value of current subscribers and, utilizing the discount rate, the present value of future subscribers. The current and future subscribers are the subassets that, when combined, total the value of the franchise.

ADL attributed the $366,872 difference between petitioner's $2,749,000 aggregate purchase price for the systems and the $2,382,129 which it determined to be the franchise value to either going concern value or an unidentifiable, nonamortizable asset. This approach comports with the residual method of computing going concern value, because

all other tangible and intangible assets have been identified. *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1324 (1989); *R.M. Smith, Inc. v. Commissioner,* 69 T.C. 317, 320-323 (1977), affd. 591 F.2d 248 (3d Cir. 1979), cert. denied 444 U.S. 828 (1979); *Jack Daniels Distillery v. United States,* 180 Ct. Cl. 308, 379 F.2d 569 (1967). M. Petry, Taxation of Intellectual Property, sec. 6.18[4], p. 6-124 (1990). This amount is undoubtedly higher than the dollar-for-dollar costs of starting up the system because ADL calculated the *value,* not the cost of startup. *UFE, Inc. v. Commissioner, supra* at 1327. Obviously the system has a high going concern value due to the favorable monopolistic environment in which it operates which, essentially, guarantees the franchise holder a more favorable return on its assets than it would receive were it not for the franchise protection. The faster a cable system is up and running, the quicker an operator can expect an income stream. With the assets of the systems under consideration already in place, this amount for going concern value is not surprising.

In any event, ADL presents a clearly reasoned and properly supported valuation of petitioner's cost basis in its cable television franchises. Accordingly, we hold that petitioner has met its burden in establishing that $2,382,129 is the proper amount for section 1253 amortization.

*An appropriate order will be issued.*