ESTATE OF STAR C. SIMPSON, DECEASED, MARK O. SIMPSON, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF M.O. SIMPSON, DECEASED, EDNA J. SULLIVAN SIMPSON, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentEstate of Simpson v. CommissionerDocket Nos. 16581-91, 16582-91United States Tax CourtT.C. Memo 1994-207; 1994 Tax Ct. Memo LEXIS 217; 67 T.C.M. (CCH) 2938; May 11, 1994, Filed *217 Decisions will be entered for petitioners. For petitioners: Charles A. Pulaski, Jr., Timothy D. Brown, and Janet E. Barton.For respondent: Stephen J. McFarlane. SHIELDSSHIELDSMEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined: (1) That on June 12, 1973, Star C. Simpson and her husband, M.O. Simpson, made taxable gifts to their son, Melvin O. Simpson, Jr., and (2) that as a result of such gifts there is due from each parent for the calendar quarter ending June 30, 1973, a deficiency in Federal gift tax in the amount of $ 331,298, as well as an addition to tax under section 6651(a)1 in the amount of $ 82,825. Star C. Simpson (Mrs. Simpson), the taxpayer involved in docket No. 16581-91, died on December 18, 1985. Thereafter her husband, M.O. Simpson (Mr. Simpson), qualified as the executor*218 of her estate, and respondent's deficiency notice was mailed to him as her executor on April 25, 1991. On the same date, April 25, 1991, respondent's deficiency notice in docket No. 16582-91 was mailed to Mr. Simpson. He died on December 31, 1991, and thereafter Edna J. Sullivan Simpson qualified as the executrix of Mr. Simpson's estate, and his grandson, Mark O. Simpson, was substituted for him as the executor of the estate of Star C. Simpson. 2 Melvin O. Simpson, Jr., predeceased his father on December 14, 1991. Consequently by February 1, 1993, the date of the trial of this matter, all three of the individuals involved in the transaction in question were deceased. Shortly before the trial, petitioners filed a motion for summary judgment that the assessment of the deficiencies and additions to tax determined by respondent was barred*219 because respondent's notices of deficiency were not issued within the period provided by section 6501(a). At the commencement of the trial, respondent filed an objection to petitioners' motion for summary judgment, together with a cross-motion for partial summary judgment, to the effect that an assessment in each case was not barred by section 6501(a). We agreed to take the parties' motions for summary judgment under advisement, but proceeded to trial. It follows, therefore, that as a preliminary matter we must dispose of the motions for summary judgment. Under Rule 121(b), summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." See Estate of Wilbanks v. Commissioner, 94 T.C. 306, 306-307 (1990); Naftel v. Commissioner, 85 T.C. 527, 529 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982); Espinoza v. Commissioner, 78 T.C. 412, 416 (1982).*220 Summary judgment is intended to expedite litigation by avoiding unnecessary and expensive trials of "phantom factual questions." Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974) (citing Cox v. American Fidelity & Casualty Co., 249 F.2d 616, 618 (9th Cir. 1957)). However, summary judgment is not a substitute for trial, since factual issues are not to be resolved in such proceedings. Espinoza v. Commissioner, supra; Shiosaki v. Commissioner, supra.The moving party bears the burden of proving that no genuine issue exists as to any material fact and that he is entitled to judgment on the substantive issues as a matter of law. Espinoza v. Commissioner, supra at 416. In deciding whether to grant either motion for summary judgment herein, we are required to view the factual material and inferences drawn therefrom in the light most favorable to the party opposing the motion. Naftel v. Commissioner, supra at 529. After due consideration of the situation before us, we have concluded*221 that summary judgment is not appropriate in these cases because there are genuine issues with respect to certain material facts. Therefore, the motion for summary judgment by each party will be denied in an appropriate order, and we will proceed to the basic issues in both dockets. The issues are: (1) Whether respondent is barred from making assessments of gift tax for the second quarter of 1973 against petitioners by the expiration of the applicable period of limitations; (2) whether petitioners are liable for gift taxes, as determined by respondent, in connection with an exchange of stock which took place on June 12, 1973, and (3) whether petitioners are liable for additions to tax under section 6651(a)(1) for failing to file timely gift tax returns for the second quarter of 1973. FINDINGS OF FACT Some of the facts have been stipulated and are so found, including an agreement by the parties that, for the purposes of these proceedings, petitioners were residents of Carmel, California, when their petitions were filed herein. The stipulations of facts and attached exhibits are incorporated by this reference. M.O. Simpson and Star C. Simpson were citizens of Canada. Prior to *222 1960, they were also residents of Canada, where Mr. Simpson had founded and originally owned all of the stock in Combined Engineered Products, Ltd. (Compro), a Canadian corporation. By 1973, Compro had become a conglomerate whose stock was publicly traded on the Toronto and Montreal stock exchanges and whose five subsidiary corporations manufactured gears, snowplows, elevators, and other products. By this time, Mr. and Mrs. Simpson had moved to Arizona and their son, Melvin O. Simpson, Jr. (Melvin), had become the chief operating officer of Compro and owned a majority of its outstanding stock as the result, at least in part, of gifts of such stock made to him by Mr. Simpson in 1959, 1960, and 1961. After moving to Arizona in 1960, Mr. and Mrs. Simpson resided for the remainder of their lives at Willow Springs, a cattle ranch (the ranch) located in Pinal County about 40 miles north of Tucson. The ranch, its 1,600 head of cattle, other livestock, and equipment, were the assets of Lazy V.P. Ranches, Inc. (Lazy V.P.), an Arizona S corporation, whose 6,525 shares of outstanding common stock were owned in equal amounts by Mr. and Mrs. Simpson. The ranch is the largest single tract of*223 land in its area and one of the largest ranch operations in Arizona. It consists of over 68,424 acres, including 14,609.52 deeded acres, 52,810.78 acres under grazing leases from the State, and 1,003.92 acres under grazing leases from the Bureau of Land Management. 3 The ranch's location is remote, since it is approximately 40 miles from the nearest full-service shopping center in Tucson. Its residence and headquarters are situated on a gravel road 10 miles from the nearest paved country road. At the date of trial, there was no appreciable development of other land in the area. The improvements on the ranch are the most extensive in that part of Arizona. The principal residence is "a showplace" with over 5,200 square feet of living area plus an enclosed patio. The residence is surrounded by a beautifully landscaped yard, a heated pool, a pool house with an area of 1,000 square feet, stables, *224 and a help house. Scattered throughout the property are 9 additional help houses, several barns and corrals, 25 wells, 19 separate fenced pastures, 26 dirt tanks or ponds, and over 10 miles of water line on which there are 7 storage tanks and 14 stock watering troughs. The remote location of the ranch, the nature and extent of its improvements, and the amount of work involved in maintaining and supervising its facilities and its operation are factors which tend to reduce its probable purchasers to a small number. Probable purchasers of the ranch would be limited to those persons having the ability and psychology to deal with such factors, as well as the requisite wealth to consummate its purchase. Mr. Simpson, who was in his 70s in 1972, supervised the operation of the ranch and apparently did so until his death in 1991. He had been an accountant before he founded Compro, and, according to his own accountant, James W. Monroe (Mr. Monroe), he was a very detail-oriented man, who kept meticulous records and controlled all aspects of the ranch operation. 4 Since the ranch had sales, and substantial amounts of cash, only after the spring and fall roundups, Mr. Simpson followed the*225 practice of making advances to Lazy V.P. as needed and withdrawing funds when available after the roundups to cover the advances and to permit annual cash gifts by Mr. and Mrs. Simpson to their son, Melvin, his wife, and their five children. Mrs. Simpson was knowledgeable about the family's business transactions, but Mr. Simpson made the decisions and spoke for them both. Mr. Monroe first met Mr. Simpson in or about the fall of 1972, when Mr. Monroe's accounting firm, Unrau & Regier, was in the process of acquiring the certified public accounting practice of C.T.R. Bates and his son, Robert L. Bates, who had been the accountants for Mr. and Mrs. Simpson since they moved to the United States in 1960. Starting with the 1972 taxable year, Mr. Monroe's firm did the accounting for the Simpsons. As a general rule, this consisted of Mr. Simpson's sending or bringing to Mr. Monroe in or about February of each*226 year the information needed for the preparation of income and gift tax returns for the preceding year. The information included a schedule of every check that the Simpsons had written during the year. With this information, Mr. Monroe's firm prepared income and gift tax returns for Mr. and Mrs. Simpson for the years 1972 through 1977. When completed, the returns were sent to the Simpsons, who signed and filed them with respondent. Copies of the gift tax returns for 1972 through 1977 are in the record. The record also contains copies of Federal gift tax returns filed by each petitioner for the calendar years 1960, 1961, 1962, 1963, 1964, 1966, 1967, 1968, 1970, and 1971. These returns were prepared by C.T.R. Bates, and the originals were filed by petitioners with respondent. A review of all of the gift tax returns filed by petitioners for 1960 through 1977 clearly indicates that, with the exception of 1960, 1961, 1965, and 1969, Mr. and Mrs. Simpson each regularly gave gifts to their son Melvin, his wife, and five children, in the amount of the annual gift tax exclusion of $ 3,000 per donee. 5 As a result, with the exception of the returns for 1960 and 1961, 6 the gift tax*227 returns filed by petitioners with respondent during this period were nontaxable. In fact, with the exception of the returns for 1960 and 1961, these returns were not even required, since no gift included therein exceeded the amount of the annual exclusion per donee. For 1960 and 1961, Mr. and Mrs. Simpson filed returns reporting gifts to Melvin in the total amounts of $ 257,043.75 and $ 100,791.70, respectively. The gifts reported in 1960 and 1961 included the forgiveness by Mr. Simpson of a note in the amount of $ 230,000 (Canadian) given by Melvin to Mr. Simpson in 1959 in payment in whole or in part for the purchase of part of Mr. Simpson's stock in Compro. These gifts gave Melvin a controlling interest in the company. Mrs. Simpson consented to the 1960 and*228 1961 gifts, and Melvin, the donee, assumed and paid the gift taxes due on both returns. Respondent examined the 1960 and 1961 gift tax returns to determine whether the sale in 1959 had been for an adequate consideration and whether there had been an intention by Melvin in 1959 to repay the note. If there had been no intent in 1959 by Melvin to repay the note, there would have been no cancellation of debt in 1960 and 1961 and hence no gifts in the latter years. Since the facts showed that the debt was genuine in 1959 and that the gift tax was voluntarily paid, 7 respondent's examiner concluded that the gift tax returns should be accepted as filed. From all of the above, it is apparent that, with the exception of 1965 and 1969, for the years 1962 through 1970, Mr. and Mrs. Simpson each filed, and respondent*229 accepted, nontaxable annual gift tax returns, even though no such returns were required since petitioners' gifts during these years did not exceed the $ 3,000 annual exclusions provided by section 2503(b). In general, petitioners appear to have made during these years gifts to each donee in the amount of the annual exclusion, as well as consenting to the gift-splitting provisions of section 2513. In 1970, section 6019(a) was amended in order to require that Federal gift tax returns reporting gifts made after 1970 be filed quarterly rather than annually. 8 However, in spite of the change made by the 1970 amendment for 1971 and 1972, each petitioner filed, and respondent accepted, a nontaxable gift tax return on Form 709 in April 1972 and April 1973, respectively. On each of the Forms 709 received by respondent from petitioners in April 1972, in the blank following the printed words "Calendar quarter ending (month and year)", there had been inserted the words "Year Ending December 31, 1971". On such Forms 709 received by respondent from petitioners in April 1973, there had been inserted in the same blanks the words "Year Ending December 31, 1972". Each Form 709 also had an attached*230 schedule which listed gifts of $ 3,000 made by each petitioner to Melvin, his wife, and their children, in the months of February or March of the preceding year, with a summation marked "Total Gifts 1971" and "Total Gifts 1972". *231 During 1974 the Simpsons did not file with respondent gift tax returns on Forms 709 for 1973. No such Forms 709 were filed because during the income tax filing period, in or about February 1974, a member of Mr. Monroe's staff, who was familiar with petitioners' practice in the past of filing gift tax returns when none were required, prepared initial drafts of nontaxable gift tax returns on Forms 709 for Mr. and Mrs. Simpson, reflecting gifts made by them in March 1973. These Forms 709 for 1973 were not completed at that time by Mr. Monroe's firm, because this was the first time Mr. Monroe had reviewed returns for Mr. and Mrs. Simpson, and, upon Mr. Monroe's review of these drafts, he concluded that no gift tax returns were required for 1973, since no gift included in the drafts exceeded the annual exclusion of $ 3,000. However, prior to or during the filing season in 1975, Mr. Monroe learned from the files his firm had obtained from C.T.R. Bates that for prior years the Simpsons had filed gift tax returns, even though the individual gifts made during the year did not exceed $ 3,000. Therefore, at Mr. Monroe's instruction, his firm completed two nontaxable Forms 709 for each petitioner; *232 i.e., one for 1973 and one for 1974. All four of these Forms 709 were executed by petitioners and filed with respondent on April 16, 1975. At the top of the first page of the Form 709 signed by Star C. Simpson, which contained all gifts made by her during 1973, the words "United States Quarterly Gift Tax Return" appeared in large bold-face type. Immediately below the bold-face type, the words "Calendar quarter ending (month and year)" appeared, followed by a blank. In the blank, the words "March 1973" had been inserted. However, on schedule A of page 2 of the Form 709, which schedule requested a description of the gifts included therein, the words "See Attached Schedule" were inserted. Attached to the Form 709 was a typewritten schedule headed by the words "Star C. Simpson (1973 Gift Tax Return)". The schedule reflected seven gifts, each in the amount of $ 3,000, made by Star C. Simpson in March 1973 in U.S. currency to Melvin O. Simpson, Jr., his wife, and their five children. At the bottom of the schedule, a summation of $ 21,000 appeared preceded by the phrase: "Total Gifts 1973". The Form 709 filed for 1973 by M.O. Simpson was identical to the Form 709 filed at the same*233 time by Star C. Simpson, except for the name of the donor. On April 16, 1975, the same day petitioners filed the Forms 709 described above for 1973, each petitioner filed a second nontaxable Form 709 with respondent. In the blank near the top of the first page of each of these Forms 709, there was inserted "December 1974" after the words calling for the "Calendar quarter ending (month and year)". However, a schedule attached to each Form 709 reflected seven gifts of $ 3,000, made to the taxpayer's son, his wife, and their five children. The schedule is headed by the petitioner's name and the words "1974 Gift Tax Return", but the date of each gift is shown as being in February 1974 by Star C. Simpson and in January 1974 by M.O. Simpson. On February 18, 1976, each petitioner filed a nontaxable Form 709 with respondent, which again reflected seven gifts each in the amount of $ 3,000 made to the same donees as set out in the returns for the preceding year. Near the top of page one of each Form 709 in the blank calling for the end of the calendar quarter, there is inserted "December 1975", even though the schedule reflecting the gifts is headed "1975 Gift Tax Return", and the date*234 of the gifts is shown as being in February 1975. On March 29, 1977, each petitioner filed a nontaxable Form 709 with respondent, which again reflected seven gifts, each in the amount of $ 3,000, made to the same donees as previously listed. In the blank near the top of page one of each of the Forms 709, where the "Calendar quarter ending (month and year)" is requested, there is inserted "December 1976", even though the attached schedule reflecting the gifts is headed "1976 Gift Tax Return" and the date of the gifts is shown as being in January 1976. On February 16, 1978, each petitioner filed a nontaxable Form 709 with respondent, which reflected seven gifts made in May 1977 to the same donees as previously listed. In the blank near the top of the first page of the Form 709, where the "Calendar quarter ending (month and year)" is requested, there is inserted "June 1977". On June 12, 1973, the Simpsons participated with their son, Melvin O. Simpson, Jr., 9 in an exchange (the exchange) with a new Canadian corporation, Melson, Inc. (Melson), which the three of them had formed. The parties intended to qualify the exchange as a nontaxable transaction under section 351 for income*235 tax purposes. Petitioner's attorney, David W. Richter, was also specifically instructed by Mr. Simpson to make sure that no gift occurred as a result of the exchange. In the exchange, petitioners transferred all of their 6,525 shares of Lazy V.P. stock and 11,675 shares of their Compro common stock to Melson, the new corporation, in exchange for 26,567 shares of Melson's voting preferred stock. The holder of the preferred stock was entitled to a 4-percent noncumulative dividend; and, in the first meeting of the board of directors of Melson, the preferred stock was given a liquidation preference of $ 100 per share for a total liquidation preference of $ 2,656,700. In the same minutes, the value of the 6,525 shares of Lazy V.P. stock was stated to be $ 400 per share, for*236 a total value of $ 2,610,000. In addition to the preferred stock, in the exchange, Mr. and Mrs. Simpson each received a promissory note in the amount of $ 266,596.82 with interest at 6 percent per annum in exchange for the unpaid balance in the same amount of a non-interest-bearing promissory note of Lazy V.P. dated May 30, 1972. Petitioners also received the right to live rent-free for the life of either of them in the ranch house owned by Lazy V.P., for which they had formerly paid rent to Lazy V.P. in the amount of $ 1,000 per month, and Mr. Simpson received the right to a salary of $ 50,000 per annum for life. In the deficiency notice, respondent determined that the interest on the notes, the dividends on the preferred stock, the right to live rent-free in the ranch house, and the salary to Mr. Simpson had a total value of $ 823,380 on June 12, 1973. Melvin and his wife transferred 193,715 common shares of Compro stock valued at $ 774,860 to Melson in exchange for 193,715 shares of Melson's common stock. After the exchange, of the total of 220,282 shares of Melson voting stock outstanding (26,567 of preferred and 193,715 of common), Melvin and his wife owned 87.9 percent *237 and Mr. and Mrs. Simpson owned 12.1 percent. There was no other Melson stock outstanding. The purpose of the exchange was to place the ranch in a position to be used as collateral for a loan, the proceeds of which would be available to Melson for making a tender offer for the publicly outstanding stock of Compro, which, at its selling price of $ 4 per share, was undervalued, in the opinion of Melvin and Mr. Simpson. The exchange was also entered into in order to enable Mr. and Mrs. Simpson to diversify their assets and to provide them with a stream of investment income so that they would not be solely dependent upon their continued operation of the ranch at their advanced age. Their attorney also recommended that the dividends on the Melson preferred stock be noncumulative, so that the stock would not be characterized by respondent as debt. Because of the low basis which Mr. and Mrs. Simpson had in their Lazy V.P. stock, Mr. Simpson insisted that the exchange qualify for income-tax-free treatment under section 351. Mr. Monroe and all other parties involved in the exchange on behalf of the Simpsons testified that, with respect to the transaction, Mr. Simpson spoke for both Mr. *238 and Mrs. Simpson and never expressed or indicated in any way that a gift to Melvin was intended. In fact, they insisted that, in their opinion, benevolent impulses 10 were foreign to Mr. Simpson and that he never indicated any intention, with respect to the exchange, other than an arm's-length bargain with Melvin. Mr. Monroe testified that Mr. Simpson "expected to be paid dividends on the [preferred] stock", but knew*239 that Melson would probably have a cash shortage in the first 2 or 3 years because of the expected loan which was to be incurred in the acquisition of the Compro stock. Consequently Mr. Monroe concluded "that [Mr. Simpson] would be paid dividends on the stock as soon as the corporation had the cash." Subsequent to the exchange of June 12, 1973, a tender offer was made by Melson for the purchase of the publicly owned stock in Compro. Still later, a law was passed in Canada which limited the amount of dividends which could be paid by Melson and other Canadian companies to the amount of dividends paid by such companies in previous years. After the enactment of this law, and as a result of the apparent inability of Melson to pay dividends on the preferred stock, Mr. Simpson threatened to sue Melson in an attempt to amend or revoke the agreement of June 12, 1973. The resulting disagreement was settled by Melson's redemption on December 22, 1978, of Mr. and Mrs. Simpson's preferred stock at its liquidation preference of $ 100 per share. Respondent determined in the deficiency notices mailed to petitioners on April 25, 1991, that the Melson preferred stock and the other considerations*240 received by Mr. and Mrs. Simpson in the exchange of June 12, 1973, were less valuable than the stock they transferred to Melson, and as a result they had made a gift in the amount of $ 2,438,669 to Melvin. For use in obtaining the funds needed to make the tender offer for the publicly owned Compro stock, the ranch was appraised on April 1, 1973, by Walter D. Armer (Mr. Armer), a real estate broker, rancher, and real estate appraiser. In making the appraisal, Mr. Armer first concluded that, even though the ranch had been profitable in Mr. Simpson's cattle operation, the profit potential from such an activity did not justify the prices being received for local properties which he considered comparable. In other words, in Mr. Armer's opinion, the highest and best use for the property was as ranch land held for investment. Therefore, in making his appraisal, Mr. Armer employed a market data approach; i.e., the evaluation of sales of properties in the area which he considered comparable, and concluded that the fair market value of the ranch was $ 3,235,135. For use by Melson in its efforts to borrow the money necessary to make the offer for the Compro stock, Mr. Monroe's accounting*241 firm used Mr. Armer's appraisal as a basis for preparing a revised balance sheet for Lazy V.P. dated May 31, 1973. The revised balance sheet reflected a stockholders' equity of $ 3,074,369.97, after taking into consideration a separate asset entitled "Deferred Profit on Installment Sales" of $ 134,003.27, an organizational expense of $ 2,183.87, and the then-current and long-term corporate liabilities of $ 542,862.42. The joint Federal income tax return of Mr. and Mrs. Simpson for 1973 was filed with respondent. Attached to the return was the following statement: TRANSFER TO CONTROLLED CORPORATION UNDER SECTION 351 STATEMENT OF TRANSFERORS AND CONTROLLED CORPORATION WITH RESPECT TO REGULATION 1.351.3 DATE OF TRANSFER: JUNE 12, 1973 Statement Re Stock Received ByM.O. & Star C. SimpsonI.D. #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 & 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Stock transferred to corporation:11,675 shares common stock of Combined Engineered Products, Ltd. Original cost: $ 97,380.646,525 shares common stock of Lazy V.P. Ranches, Inc. Basis of cost: 504,012.53Total cost (basis) 601,393.17Stock received from controlledcorporation:467 shares preferred stock Fair market value 46,700.0026,100 shares preferred stock Fair market value 2,610,000.00Total 2,656,700.00Fair market value per share $ 100.00Securities, money, other propertyreceived: NoneLiabilities transferred: NoneStatement Re Stock Received ByMelvin O., Jr. & Dorothy C. SimpsonI.D. #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 & 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Stock transferred to corporation:193,715 shares common stock of Combined Engineered Products, Ltd. Original cost: $ 1,166,387.00Stock received from controlledcorporation:193,715 shares common stock, no par value  Fair market value 774,860.00Fair market value per share $ 4.00Securities, money, other propertyreceived: NoneLiabilities transferred: NoneStatement Re Stock Issued ByMelson, Inc. (Controlled Corp.)I.D. #04-0277733Stock received by corporation:205,390 shares common stock of Combined Engineered Products, Ltd. Original cost: $ 1,263,767.646,525 shares of common stock of Lazy V.P. Ranches, Inc. Basis of Cost 504,012.23Stock issued by corporation:Number  CapitalPaid-inof sharesStock CapitalCommon, no par193,715 $ 1,166,387.00-0-  Preferred, 4% participatingnoncumulative; preference in liquidation, dissolution or distribution of assets equal to par amount 467  46,700.0050,000.6426,100 2,610,000.00-0-  26,567 2,656,700.0050,000.64220,2823,823,087.0050,000.64Capital stock issued and outstandingprior to exchange: None Securities, money, other propertyreceived: NoneLiabilities assumed: None*242 At the trial of this matter, which occurred on February 1, 1993, petitioners and respondent each presented the testimony and a report of an expert with respect to the value, at the date of the exchange, of the Lazy V.P. stock and the Melson stock. The experts disagreed as to value of both stocks, but they agreed that it was appropriate to begin their evaluation of the Lazy V.P. stock by reference to the revised balance sheet of the corporation, which was prepared by Mr. Monroe upon the basis of Mr. Armer's appraisal of the ranch as of April 1, 1973. In general, the experts also agreed on the dividend rate which was appropriate for valuing the Melson preferred stock, since the rate used by the expert for petitioners was 9 percent, while the rate used by the expert for respondent was 9.5 percent. However, their disagreements with respect to the value of the Melson stock as well as the value of Lazy V.P. stock were substantial. In his report dated December 22, 1992, petitioner's expert, Ben F. Ederer (Mr. Ederer), a corporate finance specialist who has valued and testified with respect to many closely held corporations, arrived at a value for the Lazy V.P. stock of $ 1,523,000. *243 In arriving at this conclusion, he analyzed the 1973 data on which Mr. Armer based his appraisal. First, he noted that 76.84 percent of the debt in the comparable sales used by Mr. Armer included seller financing at an average rate of 6.9 percent which was well below the market rate in use during the period of 20 percent or more, which he determined from "interviews with individuals who actively participated in the market for" such notes. Consequently, in Mr. Ederer's opinion, the selling prices of the comparable properties used by Mr. Armer were overstated by the inclusion in the selling prices of such financing. Mr. Ederer then proceeded to arrive at his value for the ranch by assuming from the comparable sales used by Mr. Armer that if a buyer bought the ranch in June of 1973 at Mr. Armer's appraisal, as revised by Mr. Monroe, or $ 3,074,370, he would have paid down 23.16 percent of the purchase price, or $ 712,024, and financed the balance, or $ 2,362,443, 11 at 6.9 percent. Mr. Ederer then calculated the present value of the hypothetical note for $ 2,362,443 (76.84 percent of $ 3,074,370) to be $ 1,463,801 by assuming that the prevailing interest rate was 20 percent and *244 that repayment would be in 10 years with level amortization of principal. In the opinion of Mr. Ederer, the present value of the note, $ 1,463,801, plus the downpayment of $ 712,024, or $ 2,175,825, constituted the present value of a sale of the property for $ 3,074,370. He then discounted the present value of the sale by 30 percent, or $ 652,718, for lack of marketability and minority interest to arrive at a value of the Lazy V.P. stock on June 12, 1973, of $ 1,523,000 (rounded). In summary, Mr. Ederer's valuation of the ranch is as follows: Assumed sales price (revised book value of ranch)$ 3,074,370Downpayment (23.16 percent)712,024Balance-seller financed (76.84 percent)2,362,443Value of $ 2,362,443 discounted for 10 years1,463,801Plus downpayment712,024Total  2,175,825Less 30-percent discount for marketabilityand minority interest  652,748Value of Lazy V.P. stock1,523,077*245 To arrive at a value for the 26,567 shares of 4-percent noncumulative Melson preferred stock that Mr. and Mrs. Simpson received in the exchange, Mr. Ederer first concluded that Melson had sufficient resources to cover the $ 2,656,700 in liquidation preference given to the preferred stock. 12 He then compared the Melson preferred stock with issues of publicly and nonpublicly traded noninvestment grade preferred stock with an aggregate value of less than $ 25 million. From this comparison he found that the market rate of dividends for comparable publicly traded stock was 8 percent and that nonpublicly traded stock required an additional .5 to 1 percent. By assuming that the required market rate of dividends on the Melson preferred would be 9 percent and that the stock would be sold at the end of 5 years, he first calculated, by using the discounted cash-flow method, that the present value of its 4-percent dividend for 5 years discounted at 9 percent would be $ 413,345. He then assumed that the 26,567 shares of preferred stock would be sold at the end of 5 years at its liquidation preference of $ 100 per share, or for a total of $ 2,656,700. He then applied a 30-percent discount*246 to the sales price, or $ 797,010, for lack of control and marketability and calculated the present value of the remainder of $ 1,859,690 discounted at 9-percent interest over a period of 5 years to be $ 1,208,671. His conclusion was that the present value of the Melson stock was the sum of the present value of the income from the stock for 5 years ($ 413,345) plus the present value of the stock from a sale after 5 years ($ 1,208,671). His calculations may be summarized as follows: Number of preferred shares26,567Annual dividend$ 4Total annual dividend106,268Present value of dividend for 5 years$ 413,345Present value of preferred stock after 5 yearsPar value $ 2,656,700Less: 30-percent discount  797,010Terminal value  1,859,690Present value at time of transactionof terminal value 1,208,671Total value of preferred stock1,622,016Respondent's expert, *247 business valuation specialist Philip J. Schneider (Mr. Schneider), is an attorney, a real estate broker, and a member of the American Society of Appraisers. In his valuation of the Lazy V.P. stock, he also began with Mr. Monroe's revised balance sheet figure of $ 3,074,370 and made two adjustments: (1) He subtracted the amount of the asset entitled "Organizational Expense", which would have no value to a purchaser, and (2) he included "Deferred Profit on Installment Sales" reduced by the amount of tax which would be due when the item was collected. His total adjustments amounted to a net increase of $ 75,630 and a valuation of $ 2,520,000 computed as follows: Book value of Lazy V.P. ranch$ 3,074,370Adjustments to book value75,630Adjusted book value3,150,000Less discount for minorityinterest and lack of  marketability: 20 percent  630,000Adjusted book value2,520,000The method employed by Mr. Schneider to value the Melson preferred stock involved two steps. First, he compared the stock with publicly traded noninvestment stock, excluding utilities, and concluded that the market rate of dividends on comparable nonpublicly traded stock was 9.5 percent. He*248 then determined that, since the 4-percent rate of dividend of the Melson stock was less than the market rate, the market value of the Melson stock was less than its redemption price. To determine a market price for the stock, he divided the $ 4 dividend by 9.5 percent and arrived at a market price per share of $ 42.11 which he discounted by 10 percent for lack of marketability. He did not include a discount for minority interest, because in his opinion such a discount was built into the price of the publicly traded stock on which he based his comparisons. His valuation of the Melson stock received by the Simpsons in the exchange is summarized as follows: Annual dividend$ 4.00Capitalized value per share($ 4.00 divided by 9.5 percent)  42.11Less marketability discount4.21Value per share37.90Shares outstanding26,567Total value of Melson preferred  (37.90 times 26,567)   1,007,000Mr. Schneider did not include in his calculation of the amount received by petitioners from the exchange any value for the additional consideration received by the Simpsons. This consideration consisted of the $ 50,000 salary to Mr. Simpson for life, free rent for the ranch*249 house for as long as either petitioner lived, interest at 6 percent on the two notes, and the 4-percent dividend from the preferred stock. Respondent determined in the deficiency notice that this consideration had a value of $ 823,380. In addition to the determination of deficiencies in gift tax, respondent's notices of deficiency also included the following statement: It is determined that since the estate tax return was not filed within the time prescribed by law and the estate has not shown that the failure to file the return on time was due to reasonable cause, twenty five percent (25 percent) of the tax ($ 82,825) is added as provided by Section 6651(a)(1) of the Internal Revenue Code. [Emphasis added.]As set out in our findings, the overall subject of the deficiency notices mailed by respondent to Mr. and Mrs. Simpson was the determination by respondent of deficiencies in gift tax as a result of gifts made by petitioners to Melvin in the exchange of June 12, 1973. With the exception of the one sentence quoted above, neither notice refers in any manner to estate tax. Petitioners contend (1) that respondent erred in determining that Mr. and Mrs. Simpson *250 were under an obligation to file an estate tax return for a period ended on June 30, 1973, and (2) that respondent erred in not determining that Mr. and Mrs. Simpson had filed gift tax returns for the quarter ended on June 30, 1973. In each answer respondent alleges that gift taxes are due from petitioner because (1) on June 12, 1973, petitioner participated in an exchange which resulted in the making of a taxable gift by petitioner; (2) a quarterly gift tax return with respect to such gift was due from petitioner on June 30, 1973; (3) petitioner failed to file a gift tax return for the period ending June 30, 1973; and (4) no gift tax return was filed, petitioner is liable for the addition to tax provided by section 6651(a) which, together with the gift tax, may be assessed against petitioner at any time. OPINION As a preliminary matter, we find that respondent's references in the notices of deficiency to estate tax and to an addition to estate tax for failure by petitioners to timely file an estate tax return are obviously in error. However, from the record as a whole, it is equally apparent that such errors were harmless inasmuch as petitioners were not misled thereby, *251 but were aware that gift taxes and additions to gift taxes were the items involved. Furthermore, respondent's answer clears up any confusion in the deficiency notices by containing specific allegations with regard to the type of tax and additions determined by respondent. Respondent contends that the Forms 709 for 1973 filed by petitioners with respondent on April 16, 1975, were not sufficient to begin the running of the period of limitations for the second quarter of 1973, the quarter in which the alleged gift occurred. Petitioners contend that, when viewed in their entirety, their gift tax Forms 709 for 1973 clearly embraced their gift tax situation for the entire calendar year of 1973, including the calendar quarter ending on June 30, 1973. Petitioners further contend that, while admittedly delinquent, such Forms 709 served to trigger the beginning of the statutory period within which respondent could assess any gift tax which petitioners incurred as a result of the exchange of June 12, 1973, especially when such Forms 709 are considered in conjunction with the statement regarding such exchange which was attached to petitioners' income tax return for 1973 as required by section*252 351. If, as contended by petitioners, the Forms 709 for 1973 which were filed by them on April 16, 1975, constituted sufficient returns to commence the running of the period of limitations provided by section 6501(a) with respect to the calendar quarter ended on June 30, 1973, the assessment of the deficiencies determined by respondent in the deficiency notices dated January 25, 1991, is barred. Respondent, however, contends that the exception set forth in section 6501(c)(3) to the 3-year period of limitations provided by section 6501(a) is applicable and that the assessment of the deficiencies is not barred since, under section 6501(c)(3), the assessment can be made at any time. Section 6501(a) states that, "Except as otherwise provided in this section, the amount of any [gift] tax imposed by this title shall be assessed within 3 years after the return [for such taxable period] was filed (whether or not such return was filed on or after the date prescribed)". Section 6501(c)(3) provides in effect that, where no gift tax return is filed with respect to a taxable gift, any gift tax due for the taxable period in which the gift was made "may be assessed, or a proceeding in court *253 for the collection of such tax may be begun without assessment, at any time." Respondent contends that the exception set forth in section 6501(c)(3) to the 3-year limitation period provided by section 6501(a) is applicable in this case because the Forms 709 filed by petitioners on April 16, 1975, did not constitute returns with respect to the gifts made by petitioners on June 12, 1973. For gifts prior to 1971, section 6019(a) required taxpayers to file gift tax returns on the basis of calendar years. However, in 1970, section 6019(a) was amended to provide that effective for gifts after December 31, 1970, "Any individual who in any calendar quarter makes any transfers by gift * * * shall make a return for such quarter with respect to the gift tax" incurred with respect to such gifts. Petitioners rely primarily upon the decision of this Court in Atlas Oil & Refining Corp. v. Commissioner, 22 T.C. 552, 557 (1954), in which a corporation which kept its books on the basis of a calendar year mistakenly filed its income tax returns for 3 years, i.e., 1942, 1943, and 1944, on the basis of fiscal years ending on November 30. We concluded that, since the fiscal*254 returns for all 3 years provided respondent with all of the facts needed to determine the income tax liability of the taxpayer for the entire 12 months of each of the 2 calendar years in dispute, i.e., 1942 and 1943, the applicable period of limitations on assessment with respect to each of the calendar years 1942 and 1943 began to run, in the absence of fraud, when the fiscal returns were filed. In other words, the filing of the income tax returns of the taxpayer for fiscal years ended November 30, 1942, and November 30, 1943, was sufficient to begin the period of limitations for calendar year 1942, since the filing of these fiscal returns contained all of the information needed to compute the taxpayer's tax liability for calendar year 1942. For the same reason, the filing of the fiscal returns for 1943 and 1944 were sufficient to begin the period of limitations for calendar year 1943. Therefore, generally speaking, our conclusion in Atlas Oil & Refining Corp. v. Commissioner, supra, was that if an income tax return filed for an incorrect taxable period, when considered in combination with other income tax returns by the same taxpayer, provides*255 respondent with all the information necessary to calculate the liability of the taxpayer for the period in question, the applicable limitation period begins to run. See also Paso Robles Mercantile Co. v. Commissioner, 12 B.T.A. 750 (1928), affd. 33 F.2d 653 (9th Cir. 1929); Mabel Elevator Co. v. Commissioner, 2 B.T.A. 517 (1925) (holding the same where the taxpayer kept books on the basis of a January 31 fiscal year but filed calendar year returns). The rationale followed in Atlas Oil, Paso Robles, and Mabel Elevator, is that when the Commissioner is given information by a taxpayer in properly executed form, i.e., on duly executed tax forms, covering all of a taxable period in issue, the period of limitations applicable to the period in issue begins to run, even though the taxpayer may have filed returns for improper periods. In other words, if a tax return filed by a taxpayer for an incorrect period, when considered together with other returns filed by the same taxpayer, provides the Commissioner with the information necessary to determine the true tax liability of the taxpayer*256 for the taxable period in dispute, the period of limitations for the period in dispute begins to run, even though the return is not for the period required by the Code. Atlas Oil & Refining Corp. v. Commissioner, supra at 559. In the case before us, petitioners had, over a period of years prior to the change from annual to quarterly reporting of gifts after 1970, followed a pattern of filing gift tax returns for almost every year in which they elected the gift-splitting provisions of section 2513, and reported gifts to their son, his wife, and children, in amounts which did not exceed the annual exclusions provided in section 2503(b). This pattern is clear from their gift tax returns for 1962, 1963, 1966, 1967, 1968, and 1970. Even after section 6019(a) was amended, effective for gifts made after December 31, 1970, to require the filing of quarterly gift tax returns, petitioners continued their pattern of filing only one gift tax return for each of the years 1971 through 1976. The returns for 1971 and 1972 were captioned in the blanks following the printed words "Calendar quarter ending (month and year)" with the words "Year Ending December *257 31, 1971" and "Year Ending December 31, 1972". The only formal difference in petitioners' 1973 returns from their returns for 1971 and 1972 was that on the 1973 returns in the blanks following the printed words "Calendar quarter ending (month and year)" were added the words "March 1973" rather than December 1973. However, in spite of this error, 13 attached to the 1973 returns were schedules listing total gifts for the year. The schedules were captioned "Star C. Simpson, 1973 Gift Tax Return", and "M.O. Simpson, 1973 Gift Tax Return". The bottom line of each schedule reflected total gifts of $ 21,000 and was labeled: "Total Gifts 1973". Petitioners continued to follow the above pattern after 1973, the year in question. Each of their gift tax returns for 1974 through 1976 reported gifts on only one occasion in each year to the same donees, and as in previous years, in amounts *258 which did not exceed the allowable exclusion. Each of the returns for 1974 through 1976 14 also contained generally the same statements used in the returns for 1971, 1972, and 1973, which clearly reflect that the returns were intended by petitioners to include gifts for the entire year. Mr. Monroe testified that his firm had acquired petitioners as new clients in 1972 and that the 1973 income and gift tax returns were the first he had reviewed for them. He further testified that, even though petitioners presented his office early in 1974 with the usual financial and tax information for 1973 and even though a member of his staff prepared for petitioners drafts of gift tax returns for 1973, he concluded that, since no taxable gifts had been made, no*259 gift tax returns were necessary. However, a year later he changed his mind, since he had subsequently learned that petitioners had followed the practice for previous years of filing gift tax returns even though none were required. Consequently, pursuant to his instructions, his office prepared petitioners' 1973 gift tax returns for filing in 1975 along with their 1974 gift tax returns. Petitioners executed and filed the 1973 returns with respondent on April 16, 1975. We find that this testimony not only explains the manner in which the disputed returns were prepared, it also constitutes a plausible explanation for petitioners' failure to file their gift tax returns for 1973 until 1975. This explanation, together with the absence from the record of any evidence, or even a suggestion by respondent, of a fraudulent intent by petitioners to evade their gift taxes, permits the use here of the rationale adopted in Atlas Oil & Refining Corp. v. Commissioner, 22 T.C. at 556. By application of the rationale adopted in Atlas Oil & Refining Corp. v. Commissioner, supra, we also conclude that the Forms 709 for 1973 filed *260 by petitioners with respondent on April 16, 1975, were sufficient to begin the running of the limitation period set forth in section 6501(a) for the second quarter of 1973, inasmuch as such Forms 709 were properly executed by petitioners and in their entirety clearly informed respondent of the gifts which petitioners made during the entire calendar year of 1973, including the year's second quarter. In other words, with these Forms 709, petitioners reported to respondent that during 1973, including its second quarter, they had made certain gifts, but incurred no Federal gift tax because of their election to use the gift-splitting provisions of section 2513 and because such gifts did not exceed the annual exclusion provided by section 2503(b). Furthermore, respondent is unable to argue that petitioners failed to disclose the exchange made in 1973, which respondent contends resulted in a substantial gift by petitioners to their son, since a statement containing all pertinent details with respect to the exchange was attached to their 1973 income tax return and filed with respondent, as required by section 351 and by section 1.351-3(a), Income Tax Regs.15 When considered together, the*261 statement attached by petitioners to their 1973 income tax return and petitioners' nontaxable gift tax returns for 1973 contain sufficient information to put respondent on notice not only of the existence of the exchange, but also that petitioners were taking the position that no taxable gift occurred as a result of the exchange.The analogy between the decisions in Atlas Oil & Refining Corp. v. Commissioner, supra, Mabel Elevator Co. v. Commissioner, supra, and Paso Robles Mercantile Co. v. Commissioner, supra, which involved income tax returns, and the case before us, which involves gift tax*262 returns, is readily apparent. Application of the rationale of those cases to the situation before us leads to the conclusion that the statute of limitations for any gift tax due from petitioners for the second quarter of 1973 began to run on April 16, 1975. This is true because on that date respondent received gift tax returns from petitioners, which returns, when considered in their entirety, clearly established that petitioners were reporting to respondent all of the gifts they had made during 1973 and that none of such gifts were taxable in the second quarter or at any other date during 1973. With this information, respondent had in her possession, on and after April 16, 1975, sufficient information to determine the gift tax liability of petitioners for the second quarter of 1973, including their gift tax liability, if any, from the exchange. We conclude, therefore, that the 3-year limitation period provided by section 6501(a) is applicable and that the assessment of the deficiencies in tax and additions to tax determined by respondent was barred when the notices of deficiency were issued on April 25, 1991. As this Court has stated in a case involving a claim for transferee*263 liability for an income tax: "The fundamental purpose of a statute of limitations is to prevent the litigation of stale claims at a time when the basic facts may have become obscured by the passage of time". Columbia Pictures Industries, Inc. v. Commissioner, 55 T.C. 649, 661 (1971) (fn. ref. omitted); see also Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 301 (1946), where the Supreme Court reached a similar conclusion with respect to a claim for income tax as follows: It probably would be all but intolerable * * * to have [a] * * * tax system under which there never would come a day of final settlement and which required both the taxpayer and the Government to stand ready forever and a day to produce vouchers, prove events, establish values and recall details of all that goes into [a] * * * tax contest. Hence, a statute of limitation is an almost indispensable element of fairness as well as of practical administration of * * * tax policy.In the case before us, respondent's claims against petitioners for gift tax are stale, not only because the deficiency notices were not issued by respondent until*264 more than 16 years after respondent was given notice by petitioners of the exchange involved, but also because by the time the case was tried, of the three individuals directly involved in the exchange, one (Mrs. Simpson) had been dead for over 8 years and two (Mr. Simpson and Melvin) had each been dead for over 1 year. Furthermore, respondent admitted at trial that even her copies of the returns involved had been destroyed. Under these circumstances, we believe that our decision set forth above is not only technically correct under the applicable law, but that justice requires the conclusion in this case that respondent has allowed the gift tax claims upon which the case is bottomed "to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 349 (1944). Therefore, the right of the deceased petitioners to be free of respondent's stale claims has reached the point, in our opinion, where petitioners' right to prevail in this case exceeds respondent's right to prosecute the tax claims. Order of R.R. Telegraphers, Id. at 349.*265 Did Petitioners Make a Gift by Means of the 1973 Exchange?Even though our decision with respect to the statute of limitations essentially disposes of the entire case before us, we turn now to the question of whether petitioners, as a result of receiving stock worth less than the stock they surrendered in the exchange, made an indirect gift to their son Melvin and, if so, whether respondent's determination of the amount of the gift, and consequently the tax deficiency, is correct. In the deficiency notices, respondent determined that in the exchange Mr. and Mrs. Simpson made their son a gift in the amount of $ 2,438,669 and that there was due from each petitioner a deficiency in gift tax in the amount of $ 331,298. At trial and on brief, respondent argued for a lesser deficiency on the basis of her expert's report, which concluded that the amount of the gift was only $ 1,559,700, which is the difference between the $ 2,566,700 found by the expert as the value of the stock contributed by the elder Simpsons (Compro stock valued at $ 46,700 plus Lazy V.P. stock valued at $ 2,520,000) and his valuation of $ 1,007,000 for the Melson preferred. Respondent further argues on brief*266 that any consideration other than preferred stock received by petitioners in the exchange was of nominal value. We are unable to understand this contention by respondent because in their stipulation the parties agreed that there was other consideration; and in fact, in the deficiency notice, respondent determined that additional consideration was received by petitioners which had a value of $ 823,380 computed as follows: Interest at 6-percent on promissory notes$ 32,000Promise of annual salary to Mr. Simpson50,000Rent-free use of house12,000Income from preferred stock5,000Total annual projected income  99,000Times capitalization rate8.316971Total value  $ 823,380Respondent's determination is presumed to be correct. Furthermore, on brief petitioners agree. We conclude, therefore, that additional consideration was received by petitioners in the exchange in the amount of $ 823,380. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Ordinarily, a sale or exchange made in the ordinary course of business "will be considered as made for an adequate and full consideration in money or money's worth." Sec. 25.2512-8, Gift*267 Tax Regs. However, "Where property is transferred for less than an adequate and full consideration in money or money's worth, * * * the amount by which the value of the property [transferred] exceeds the value of the consideration [received] shall be deemed a gift". Sec. 2512(b). Furthermore, as here, where transfers are made in a family context they are subject to special scrutiny. Heringer v. Commissioner, 235 F.2d 149, 151 (9th Cir. 1956), modifying 21 T.C. 607 (1954); Fitz Gibbon v. Commissioner, 19 T.C. 78, 84 (1952). In addition, with respect to such family transfers, a donative intent on the part of the transferor is not an essential element, since the application of the tax is based on the objective facts involved rather than on the subjective motives of the donor. Sec. 25.2511-1(g)(1), Gift Tax Regs. In this case, the parties disagree on the value of both the Lazy V.P. stock which Mr. and Mrs. Simpson gave up in the exchange and the value of the Melson preferred stock which they received. They agree, however, that the value of the 11,675 shares of Compro stock transferred to Melson*268 by Mr. and Mrs. Simpson was $ 46,700. The valuation of the Lazy V.P. stock is a question of fact, with respect to which we must weigh all the evidence and draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Tele-Communications, Inc. v. Commissioner, 95 T.C. 495, 516 (1990), affd. 12 F.3d 1005 (10th Cir. 1993). In the absence of an open market for the stock, it is proper to consider all the facts and circumstances related to the corporation in determining the fair market value of its stock. O'Malley v. Ames, 197 F.2d 256, 257-258 (8th Cir. 1952). In valuing the stock we are not bound by the opinions of the expert witnesses. Instead we may reach a decision on the basis of our own analysis of all of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974);*269 Hamm v. Commissioner, 325 F.2d at 940-941. The experts differ by almost $ 1 million in their valuation of the Lazy V.P. stock. However, they both began their analysis with the same figure, the revised net asset value of $ 3,074,370, shown on Lazy V.P.'s balance sheet as determined by Mr. Monroe from the appraisal by Mr. Armer on April 1, 1973. Respondent contends that the Armer appraisal presents an accurate value for the ranch. Petitioners contend that the value in the Armer appraisal is overstated. As set forth in our findings, Mr. Schneider, respondent's expert, appraised the Lazy V.P. stock at $ 2,520,000. To do so he adjusted the net asset value found by Mr. Monroe, of $ 3,074,370, upward by $ 75,630, removing the asset identified as "Organization Expense" and including an asset called "Deferred Profit on Installment Sales", less the estimated tax which would be payable when the installments were collected. He also discounted the net asset value found by Mr. Armer by a 20-percent discount, or $ 630,000, for lack of marketability and control to arrive at his $ 2,520,000 valuation. In valuing the Lazy V.P. stock, petitioners' expert, Mr. Ederer, *270 also began with the net asset value of the ranch of $ 3,074,370 as revised by Mr. Monroe. Mr. Ederer first analyzed the 12 comparable land sales used in the Armer appraisal. From this analysis he concluded, as set out in our findings, that the comparable sales used by Mr. Armer were seller-financed at below-market rates of interest for the type of property involved. Consequently, in Mr. Ederer's opinion, the stated principal amounts in Mr. Armer's comparable sales contained an interest component, which tended to overstate the cash value of the property involved. This overstatement caused Mr. Armer's comparable sales to be inflated, and this in turn caused an overstatement in Mr. Armer's evaluation of petitioners' ranch. However, by reference to the comparable sales found by Mr. Armer, Mr. Ederer concluded that if petitioners sold the ranch at Mr. Armer's net appraised value, or $ 3,074,370, they could expect to receive (1) a 23.16-percent downpayment or $ 712,024 and (2) a note for the remaining 76.84 percent, or $ 2,362,433, 16 which would bear interest at 6.9 percent for a period of 10 years, and have a cash value at the date of the sale of $ 1,463,801. To arrive at his final*271 valuation for the ranch, Mr. Ederer took the sum of the $ 712,024 downpayment and the $ 1,463,801 cash value of the note for a total of $ 2,175,825, 17 which he discounted by 30-percent, or $ 652,748, for lack of marketability and control to arrive at his final valuation of $ 1,523,077 (rounded to $ 1,523,000) for the ranch and hence for the Lazy V.P. stock. As set forth in our findings, petitioners obtained and used the Armer appraisal to write up the value of the assets of Lazy V.P. to its value as reflected in the appraisal. From the record before us, it is apparent that the reason for the revision of the financial statement of Lazy V.P. based upon the appraisal was to obtain credit to finance a tender offer for the publicly held stock of Compro. Therefore, *272 it is equally apparent that, at the time of Mr. Armer's appraisal, petitioners had a substantial motive to overvalue rather than undervalue the assets of the ranch. There is no direct proof in the record that their motive was conveyed to Mr. Armer or that, if it was conveyed, it had any influence on his appraisal. However, from the record as a whole and particularly the testimony of Mr. Monroe and Mr. Richter, it appears that Mr. Armer was aware that the appraisal was being made for use in connection with the prospective loan. In any event, we are convinced that the Armer appraisal contains an intentionally inflated value for the ranch probably because Mr. Armer knew that the ranch was to be used by Melson after the exchange as collateral for the projected loan to obtain the funds needed to make the tender offer. We base this conclusion in part upon preliminary statements in the appraisal itself, in which all of Mr. Armer's assumptions or deviations from standard practice tend to increase the appraised value of the ranch. It is also based in part upon his selection and use of comparables. The ranch is composed of 14,609.52 acres of deeded land and 53,814.17 acres of leased land. *273 The deeded land is more valuable because the use of the leased land is limited to the grazing of livestock. Consequently the deeded land represents the majority of the value of the ranch. The following is a summary of Mr. Armer's appraisal: Deeded land$ 1,972,285Leased land420,000Improvements100,000Cattle737,000Horses23,850TOTAL  3,253,135Mr. Armer found the value of the deeded land to be $ 135 per acre. However, in so doing, he excluded some sales at much lower figures, such as $ 89.33 per acre for one parcel and $ 48.13 per acre for another. At first glance, the difference would appear to be relatively insignificant, but when multiplied by the 14,609 acres involved it becomes substantial. We are aware of the fact that the value of land is influenced by many factors, but we are satisfied that Mr. Armer purposely chose the more expensive comparables. In his appraisal of the deeded land, all of the comparable sales used by Mr. Armer contained substantial amounts of seller debt, which as pointed out by Mr. Ederer and set forth in our findings, was at a substantially lower rate of interest than the prevailing market rate of interest on such debt. Therefore, *274 the use by Mr. Armer of such sales as comparables without adjusting their sales prices for the debt included therein tended to overstate Mr. Armer's comparables and ultimately his appraisal of the deeded land of Lazy V.P. In his appraisal of the leased land, Mr. Armer used what is referred to as the carrying capacity of the leased land to determine its value. This is an accepted practice in the area for the appraisal of leased land. The carrying capacity is the number of cattle or animal units which each section of land (1 square mile or 640 acres) will support. In his appraisal, Mr. Armer used 10 animal units per section even though the rate approved by the State of Arizona was only 9 animal units per section. Here again, the use of only one more animal unit per section appears to be insignificant, but the difference is substantial, since 84 sections are involved and the accepted value per animal unit is $ 500. The value of property is the price in cash at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of all relevant facts. Sec. 25.2512-1. Gift*275 Tax Regs.; McShain v. Commissioner, 71 T.C. 998, 1004 (1979). In reaching our conclusion herein, we emphasize that the fair market value of property is the cash price the property would have brought at the time of its transfer. Kaplan v. United States, 279 F. Supp. 709 (D.Ariz. 1967). Therefore, when, as in this case, the property under consideration is so large that its sale would in all probability require a downpayment plus substantial deferred payments, its evaluation is equal to the estimated cash downpayment plus the present value of the stream of future payments. Goldstein v. Commissioner, 89 T.C. 535, 548-549 (1987). For this reason, we are satisfied and so find that the appraisal made by Mr. Ederer, petitioners' expert, is more accurate and more reasonable under the circumstances than the appraisals made by Mr. Armer and respondent's expert. Furthermore, Mr. Ederer's qualifications as well as his method of appraisal, which are both set forth in our findings, were not refuted by respondent. Therefore, we conclude that the value of the ranch on the date of the exchange, and hence*276 the value of the Lazy V.P. stock before any discount for marketability was $ 2,175,825. At trial, both experts allowed discounts with respect to the stock in Lazy V.P. for lack of marketability and control, which they combined into one figure. Although there is some overlap between the two discounts, they are conceptually different, because a minority discount with respect to stock in a closely held corporation is generally used to reflect the decreased value of shares that do not represent control of the corporation. On the other hand, a discount for lack of marketability reflects the recognition of facts which established that there is a limited market for a certain asset including one represented by all of the shares in a closely held corporation. Estate of Andrews v. Commissioner, 79 T.C. 938, 952-953 (1982). In this case, petitioners' expert used a combined discount of 30 percent, while respondent's expert used a combined discount of 20 percent. We are convinced that a 30-percent discount for lack of marketability alone is appropriate because of the many factors set forth in our findings which combine to reduce the market for the ranch. First*277 and foremost, the ranch involves an extremely large tract of land, consisting of almost 70,000 acres, of which approximately 80 percent is held under leases in which the use of the land is limited to the grazing of livestock. It is not only the best and the largest single tract in the area; it is one of the largest ranching operations in the State of Arizona with a luxurious house and numerous other improvements. In addition to the awesome size of the tract, the property includes a working ranch operation with over 1,600 head of cattle, more than 50 horses, numerous pieces of equipment, several employees, at least 10 tenants, several miles of water line, and many more miles of fencing. Under the circumstances, we agree with Mr. Armer's conclusion that, while the ranch under its operation by Mr. Simpson was profitable, its profits did not justify the prices being paid for other property in the area, and therefore, its highest and best use was as ranch land held for investment. However, future development would be limited to the 20 percent represented by the deeded acres and not to the 80 percent under grazing leases. But as an operating ranch, we find that prospective buyers for*278 the property would be limited to those parties, like Mr. Simpson, who are financially able to purchase the property plus being content to (1) live on a remote ranch located on an unpaved road 40 miles from the nearest shopping center and manage a massive ranch operation, as Mr. Simpson had done, at a low profit, or (2) employ a qualified manager or managers and be satisfied with an even lower profit, or more probably a loss, with the prospect and hope that the deeded acres could eventually be developed. Since the possibility of such development does not apply to the leased portion of the land (approximately 80 percent) and the possible development of the balance can only be considered for the distant future, due to the remoteness of the ranch, the prospects of finding such a buyer are unlikely. Therefore, under these circumstances, we have no difficulty in concluding that a 30-percent discount for lack of marketability is fully justified. While both experts mentioned a discount for lack of control, we give little weight to this factor since Mr. and Mrs. Simpson owned 100 percent of the Lazy V.P. stock at the time of the exchange and acted in concert at Mr. Simpson's direction. *279 For the foregoing reasons, we conclude that the value of the Lazy V.P. stock at the time of the exchange was $ 1,523,009 as found by petitioner's expert. We now turn to the valuation of the 26,567 shares of Melson preferred stock which Mr. and Mrs. Simpson received in the exchange, which value is established by an objective test using hypothetical buyers and sellers, rather than positing any particular buyer or seller, such as a family member or other related party. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982); Kolom v. Commissioner, 71 T.C. 235, 244 (1978), affd. 644 F.2d 1282 (9th Cir. 1981); Lefrak v. Commissioner, T.C. Memo. 1993-526. When preferred stock has a below-market dividend rate, there is no economic equivalence between the face value of the stock and its market value. In such case, the value of the shares is determined by the rate of dividends and the degree of risk associated with the particular investment. At a time when an unrelated*280 investor could obtain a rate of 6.84 percent on long-term Government securities, he would not be willing to pay $ 100 per share for closely held, noncumulative preferred stock paying only 4 percent. See Provident National Bank v. United States, 581 F.2d 1081, 1089 (3d Cir. 1978). The two experts were close to agreement in their conclusions on the required return in this case. Mr. Ederer's opinion of the market rate of dividends for comparable nonpublicly traded noninvestment grade preferred stock was 9 percent, while Mr. Schneider's rate was 9.5 percent. The virtual agreement of the experts on the rate of dividends which the market would require for this stock means that they also agree, by implication, on the degree of risk which the stock presents, including such factors as Melson's ability to pay dividends. Mr. Ederer valued the Melson preferred using a discounted cash-flow method. This method computes the present value of the estimated future cash-flow from the stock. In its application, first the cash-flow is determined for a certain period. Second, a discount rate is applied to determine the present value of the future cash-flow. Third, *281 the residual value of the business at the end of the projection period is determined. Fourth, the present value of the residual value is computed. Fifth, the present value of the projected cash-flow is added to the present value of the residual value to arrive at the value of the stock. Estate of Jung v. Commissioner, 101 T.C. 412, 424 n.6 (1993). Mr. Ederer assumed that the assets underlying the preferred stock were of the type held for appreciation and that they would be held for a period of 5 years before liquidation. He then valued the income stream from the Melson stock for 5 years ($ 4 per share or $ 106,268 per year), assuming a market interest rate of 9 percent, and concluded that the present value of such income was $ 413,345. Assuming that the stock would be sold after 5 years at its liquidation value for $ 2,656,700, he applied a 30-percent discount for lack of marketability and minority interest, and arrived at a terminal value of $ 1,859,690. He then discounted the terminal value figure at 9 percent to produce a present value of $ 1,208,671. He concluded that the total of the present value of the income ($ 413,345) and the terminal*282 value of the stock ($ 1,208,671), or $ 1,622,016, was the value of the Melson preferred. Respondent's expert, Mr. Schneider, valued the Melson preferred by beginning with the $ 4 dividend and calculating a price which, at that dividend level, would yield a market rate on the investment. In his report he concluded that "The value of a preferred stock lacking any common equity kicker, such as convertibility or other special features, is equal to the present value of its future income stream discounted at its required rate of return, or yield." If the market rate of dividends was 9.5 percent, a buyer would be willing to pay $ 42.11 for a share of comparable stock paying a $ 4 dividend. ($ 4.00/.095 = $ 42.11.) Mr. Schneider's calculation makes no mention of the period of time involved or the fact that the preferred apparently had no stated redemption date. In effect, he assumed that the dividend would be paid indefinitely or that the preferred could eventually be redeemed at market value. Mr. Schneider reduced this amount by a 10-percent discount for lack of marketability, $ 4.21 per share, to give a value of $ 37.90 per share. He included no discount for minority interest, since*283 he stated that such a discount is built into the price of the publicly traded stock on which he based his market comparisons. Mr. Schneider concluded that the value of the 26,567 shares of Melson stock received by Mr. and Mrs. Simpson was $ 1,006,623.63, rounded to $ 1,007,000. For the following reasons, we find that Mr. Schneider's valuation of the Melson preferred is more accurate than that of Mr. Ederer. The value of the stock is established on the day of the exchange on the basis of market conditions on that date. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). As stated above, the willing buyer, willing seller standard is an objective standard in which the parties are hypothetical individuals. Propstra v. United States, 680 F.2d 1248, 1252 (9th Cir. 1982). The officers and directors of Melson apparently contemplated redemption of Mr. and Mrs. Simpson's stock at the liquidation preference, which they intentionally set at an amount close to the net value of the assets of the ranch in the Armer appraisal. Mr. Richter testified that, as a result of Mr. Simpson's threat of a lawsuit, the elder Simpsons' *284 stock was redeemed. However, an unrelated buyer of a 12.1-percent voting interest in a corporation, would have had much less leverage and no formal mechanism to obtain the value of his stock by redemption or liquidation. Consequently he would have no basis for concluding that its value was equal to its liquidation preference. Consequently, the subsequent redemption of Mr. and Mrs. Simpson's stock is not an event that should be taken into account in valuing the stock, since the redemption neither affected market value as of the valuation date nor offered evidence of market value as of that date. Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993). Preferred stock which lacks convertibility or some other equity feature does not participate in the growth of the corporation's value. It is in some ways similar to debt, since its value is determined by the corporation's ability to pay dividends, the stock's yield, and the protection of the stock's liquidation preference. See Stark v. Commissioner, 86 T.C. 243, 250-251 (1986); see also Provident National Bank v. United States, 581 F.2d 1081, 1089 (3d Cir. 1978);*285 Estate of Goodrich v. Commissioner, T.C. Memo. 1978-248 (experts and the Court valued preferred stock by beginning with annual dividend and calculating a price which, at that dividend level, would yield a market rate on the investment); Koffler v. Commissioner, T.C. Memo. 1978-159 (best valuation method for preferred stock is to capitalize the annual dividend at market rate of dividends with adjustment for lack of marketability). For the reasons stated above, we conclude that the value of the Melson stock received by the Simpsons in the exchange was $ 1,007,000, as determined by respondent's expert. The parties have stipulated, and we have found that, in addition to the Melson preferred stock, petitioners also received in the exchange additional consideration with a total value of $ 823,380. 18 The additional consideration consisted of interest at 6 percent on the two notes which were substituted for two non-interest-bearing notes, permission to live rent-free in the ranch house, a salary of $ 50,000 for Mr. Simpson, and dividends on the preferred stock. *286 We conclude, therefore, that in the exchange petitioners received from Melson the following consideration with values as shown: Value Melson preferred stock$ 1,007,000Additional consideration823,380TOTAL  1,830,380We also conclude that in the exchange Melson received from petitioners the following assets with values as shown: Value Lazy V.P. stock$ 1,523,009Compro stock46,700TOTAL  1,569,709In addition to our conclusion hereinbefore that the assessment of any gift taxes which petitioners may have incurred by reason of the exchange is barred under section 6501(a), we also conclude that the exchange did not result in a gift being made by petitioners to their son, since the value of the assets received by petitioners in the exchange exceeds the value of the assets received by Melson. We also conclude that, in view of our conclusions with respect to issues (1) and (2), petitioners are not liable for additions to tax under section 6651(a). Orders denying the motions for summary judgment will be issued, and Decisions will be entered for petitioners. Footnotes1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩2. As used hereinafter, the words petitioner or petitioners↩ will refer to M.O. Simpson and/or Star C. Simpson or their respective estates as the particular situation requires.3. The use of the ranch land under lease (about 80 percent of the total acreage) is limited to the grazing of livestock.↩4. Mr. Monroe also described Mr. Simpson as being the most stubborn person he had ever met in his entire lifetime.↩5. In some years, gifts were also made in the amount of the annual exclusion to a few unidentified individuals.↩6. The record does not contain copies of gift tax returns for 1965 and 1969, apparently because no such returns were filed for those years.↩7. Respondent's examiner also noted that, since the subject of the gifts was stock in a Canadian corporation and the gifts were made by Canadian citizens and residents, it was probable that no gift tax was due.↩8. The 1970 amendment of sec. 6019(a) to require quarterly filing of gift tax returns was enacted as part of a series of provisions designed to speed up collections of estate and gift taxes. It made gift taxes in the future payable more currently and as a result gave the Commissioner the use of the tax money at an earlier date. H. Rept. 91-1078, at 13-14 (1970). However, sec. 6019(a) was again amended in 1981 in order to require annual rather than quarterly filing of gift tax returns. The following reason was given for the change back to annual filing: "The committee believes that the quarterly filing requirement has caused confusion and undue administrative burdens for the affected taxpayers and the Internal Revenue Service. Accordingly, the committee believes that returns should be filed on an annual basis." H. Rept. 97-201, at 195 (1981), 1981-2 C.B. 394↩.9. The wife of Melvin O. Simpson, Jr., also participated at least to the extent that her name appeared on the stock acquired by her husband in the exchange, but she apparently did not participate in the negotiations leading up to the transaction.↩10. When confronted on cross-examination with the observation that perhaps the numerous gifts made by Mr. Simpson over the years to his son, daughter-in-law, and five grandchildren were at odds with a lack by Mr. Simpson of benevolent impulses, Mr. Monroe disagreed; he observed that in his opinion such gifts by Mr. Simpson were more in the nature of taking maximum advantage of tax "freebies". Further support for Mr. Monroe's observation might be found by some in the forgiveness by Mr. Simpson of the note due from the son for the Compro stock if the son agreed to assume and pay any gift taxes incurred.↩11. The amount in Mr. Ederer's report, $ 2,362,443, is an apparent arithmetic error. The correct amount is $ 2,362,346. We leave Mr. Ederer's amount unchanged, as it is the basis of his present value calculations. We have reproduced Mr. Ederer's calculations largely as they appear in his report, including other arithmetic errors, since they are relatively small and do not tend to cause substantial distortions.↩12. This conclusion is supported by the fact that in approximately 5 years the preferred stock was redeemed for this amount.↩13. Mr. Monroe testified that this was an error made by someone in his office and was overlooked in his review of the returns for 1973.↩14. Unlike the Forms 709 filed by petitioners for 1972 through 1976, the Forms 709 filed by petitioners on January 16, 1978, indicated in the proper blanks that they were for the calendar quarter ending on June 30, 1977, and the date of the reported gifts was May 1977.↩15. The regulations pursuant to sec. 351 recognize the possibility that a taxpayer may make an indirect gift by means of a sec. 351 transfer. Part of the purpose of the statement required by sec. 1.351-3(a), Income Tax Regs., is to put respondent on notice of such a gift. See sec. 1.351-1(b)(1) and (2), Income Tax Regs.↩16. The correct amount is $ 2,362,346. We have not corrected this relatively minor error, as $ 2,362,443 is the basis of Mr. Ederer's further calculations.↩17. Apparently in error Mr. Ederer used the figure $ 2,175,727 in his computation at this point.↩18. In the stipulation of facts, the parties agreed that Mr. and Mrs. Simpson's 1973 Federal income tax return was admitted into evidence solely to resolve the issue of whether it was effective to trigger the statute of limitations for gift tax. The stipulation states that this document is not to be relied upon for any other purpose. The statement required by sec. 1.351-3(a), Income Tax Regs., attached to this return states that no securities, money, or other property were received by either party in the exchange. We are aware of the doctrine that taxpayers in certain circumstances are bound by a duty of consistency, which would bar them from taking a position inconsistent with that taken in a prior year. When a taxpayer has received a benefit in a prior, closed year, he may be restricted from changing his position so as to receive a second benefit, even though the position in the earlier year may be erroneous. Unvert v. Commissioner, 72 T.C. 807 (1979), affd. 656 F.2d 483↩ (9th Cir. 1981). Respondent determined in the deficiency notice and stipulated at trial to the existence of the additional consideration without raising this issue, so we do not consider it.